# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP1294-CR |
| COMPLETE TITLE: | |

State of Wisconsin,
           Plaintiff-Respondent,
      v.
Lewis O. Floyd, Jr.,
           Defendant-Appellant-Petitioner.

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 371 Wis. 2d 404, 885 N.W.2d 156
PDC No:  2016 WI App 64 - Published

| | |
|---|---|
| OPINION FILED: | July 7, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 19, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Racine |
| JUDGE: | Allan B. Torhorst |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | A.W. BRADLEY, J. dissents, joined by ABRAHAMSON, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

     For the defendant-appellant-petitioner, there were briefs by *Michael G. Soukup* and *Pinix & Soukup*, *LLC*, Milwaukee, and oral argument by *Michael G. Soukup.*

     For the plaintiff-respondent, there was a brief filed by *Luke N. Berg*, deputy solicitor general, *Brad D. Schimel*, attorney general, and *Misha Tseytlin*, solicitor general, and oral argument by *Luke N. Berg.*

     An amicus curiae brief was filed by *Kelli S. Thompson*, state public defender, and *L. Michael Tobin*, deputy state public defender.

2017 WI 78

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.    2015AP1294-CR
(L.C. No.  2013CF982)

STATE OF WISCONSIN                     :        IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

  v.

Lewis O. Floyd, Jr.,

      Defendant-Appellant-Petitioner.

**FILED**

**JUL 7, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1    DANIEL   KELLY,   J.   A   law   enforcement   officer discovered a cache of controlled substances when he performed a warrantless——but allegedly consensual——search of Lewis O. Floyd, Jr. during a traffic stop.  Mr. Floyd says that because the officer extended the traffic stop without the necessary reasonable suspicion, his alleged "consent" was void and the evidence obtained from the search should have been suppressed. Mr. Floyd also says he received ineffective assistance of counsel at the suppression hearing because his trial counsel

failed to present testimony Mr. Floyd believes would have established he was not asked to consent to a search.[1]

## I.  BACKGROUND

### A.  The Traffic Stop

¶2   On an early July evening in 2013, Deputy Troy Ruffalo of the Racine County Sheriff's Office stopped Mr. Floyd near 16th and Racine Streets in the City of Racine because his car registration had been suspended for emissions violations. Deputy Ruffalo, a six-year veteran law enforcement officer, believed this to be a "high crime" part of the city known for frequent drug and gang activity.

¶3   When Deputy Ruffalo approached Mr. Floyd's car, he noted it had tinted windows and "air fresheners in every vent of the vehicle as well as hanging off the rear view mirror and air fresheners up on the -- where the vents were." This, he said, is often an indicator of drug-related activity because "[u]sually the air fresheners or the amount of them are -- is an agent that is used to mask the smell of narcotics."[2]

¶4   Deputy Ruffalo's initial contact with Mr. Floyd lasted approximately two to three minutes, during which he discovered

---

[1] This is a review of a published decision of the court of appeals, State v. Floyd, 2016 WI App 64, 371 Wis. 2d 404, 885 N.W.2d 156, affirming the judgment and order of the circuit court for Racine County, as well as the denial of Mr. Floyd's motion for postconviction relief, the Hon. Allan B. Torhorst, presiding.

[2] The record does not identify the exact number of air fresheners present in Mr. Floyd's vehicle.

Mr. Floyd had no driver's license or insurance information with him. After obtaining Mr. Floyd's Wisconsin State identification card, Deputy Ruffalo returned to his squad car to draft Mr. Floyd's citations and contact dispatch to ask for a canine unit or other "cover" squad. No canine units were available, and Officer Aaron White, an officer with the City of Racine Police Department, arrived on the scene while Deputy Ruffalo was completing Mr. Floyd's citations.

¶5 Deputy Ruffalo reestablished contact with Mr. Floyd approximately five or six minutes after pulling him over and, while maintaining possession of Mr. Floyd's identification card and the multiple citations, asked Mr. Floyd to exit the vehicle so he could explain the citations. After Mr. Floyd complied, Deputy Ruffalo asked him if he had any weapons or anything that could harm him. After Mr. Floyd indicated he did not, Deputy Ruffalo asked if he could perform a search for his safety. Mr. Floyd responded "yes, go ahead."[3] During the ensuing search, Deputy Ruffalo discovered the illegal drugs that led to the charges in this case.

B. Procedural Background

¶6 The State filed a criminal complaint against Mr. Floyd alleging: (1) possession with intent to deliver non-narcotic controlled substances, second and subsequent offense; (2)

---

[3] To the extent there is a dispute as to whether Mr. Floyd voluntarily consented to the search, we address that question in Section III.B, infra.

misdemeanor bail jumping, repeater; (3) possession with intent to deliver or manufacture THC <= 200 GMS, second and subsequent offense; and (4) misdemeanor bail jumping, repeater. The subsequent Information alleged the same four counts.

¶7 Mr. Floyd moved to suppress the evidence seized during the search, but the circuit court denied the motion. It found that at the time Deputy Ruffalo contacted dispatch for backup, he had suspicions Mr. Floyd was involved in criminal drug-related activity based on several factors, including the numerous air fresheners and the vehicle's tinted windows. It also found that Deputy Ruffalo did not unnecessarily prolong the traffic stop by requesting backup because the cover squad arrived while he was in the process of drafting the citations—a process that took only five to six minutes. The circuit court accepted Deputy Ruffalo's explanation that having Mr. Floyd step out of his vehicle was important because he did not have a valid driver's license and therefore could not drive away when the traffic stop ended.

¶8 Mr. Floyd pled no-contest to possession with intent to deliver non-narcotic controlled substances as a repeat offender. He moved for postconviction relief, alleging his trial counsel was ineffective for failing to present evidence at the suppression hearing that (he says) would have proved Deputy Ruffalo did not ask for his consent to perform the search. The circuit court observed that Officer White's testimony showed "some dichotomy" with respect to whether Deputy Ruffalo had asked for Mr. Floyd's consent to the search or instead had

4

advised him it was going to happen. Ultimately, the circuit court found Deputy Ruffalo did, in fact, ask Mr. Floyd whether he would consent to the search. Thus, the court concluded Mr. Floyd did not receive ineffective assistance of counsel because the testimony was insufficient to demonstrate he had not consented to the search, and so denied the motion.

¶9 The court of appeals affirmed in a published opinion, concluding that denial of the suppression motion was proper because Mr. Floyd was lawfully detained when Deputy Ruffalo asked to search him and Mr. Floyd voluntarily consented to the search. See State v. Floyd, 2016 WI App 64, ¶¶12, 20, 371 Wis. 2d 404, 885 N.W.2d 156. Relying on Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam), the court of appeals concluded that Deputy Ruffalo's request that Mr. Floyd exit his vehicle during the ongoing traffic stop was per se lawful, and it also pointed out that Mr. Floyd could not drive away because he did not have a valid driver's license. Floyd, 371 Wis. 2d 404, ¶12. The court of appeals further held that even if Deputy Ruffalo had extended the traffic stop, the extension was nevertheless reasonable because Deputy Ruffalo reasonably suspected criminal drug-related activity. Id., ¶13. As to the postconviction motion, the court of appeals determined there was no reasonable probability the result at the suppression hearing would have been any different had Officer White been called to testify; therefore, it affirmed the circuit court's denial of the postconviction motion. Id., ¶27.

5

¶10 We accepted Mr. Floyd's petition for review and now affirm the decision of the court of appeals.

II. STANDARD OF REVIEW

¶11 "Whether evidence should be suppressed is a question of constitutional fact." State v. Knapp, 2005 WI 127, ¶19, 285 Wis. 2d 86, 700 N.W.2d 899 (quoting State v. Samuel, 2002 WI 34, ¶15, 252 Wis. 2d 26, 643 N.W.2d 423). We review the circuit court's findings of historical fact under the clearly erroneous standard. State v. Turner, 136 Wis. 2d 333, 343-44, 401 N.W.2d 827 (1987). But the circuit court's application of the historical facts to constitutional principles is a question of law we review independently. Id. While we are not bound by the circuit court's or court of appeals' decisions on questions of law, we benefit from their analyses. State v. Kyles, 2004 WI 15, ¶7, 269 Wis. 2d 1, 675 N.W.2d 449.

¶12 We review the voluntariness of consent to a search in a similar fashion. See State v. Artic, 2010 WI 83, ¶23, 327 Wis. 2d 392, 786 N.W.2d 430. We review the circuit court's findings of historical fact to determine whether they are clearly erroneous. Id. We then independently apply constitutional principles to those facts. Id.

¶13 Whether trial counsel's actions constitute ineffective assistance of counsel presents a mixed question of fact and law. State v. Tourville, 2016 WI 17, ¶16, 367 Wis. 2d 285, 876 N.W.2d 735. We will not reverse the circuit court's findings of fact unless they are clearly erroneous. Id. However, we

independently review, as a matter of law, whether those facts demonstrate ineffective assistance of counsel. Id.

### III. DISCUSSION

¶14 We must determine whether the drug-disclosing search of Mr. Floyd was consonant with the constitutional mandate that we be free of unreasonable searches and seizures. The State says the search was proper because it occurred during a lawful traffic stop and Mr. Floyd consented to it. Mr. Floyd says this is not so——the search took place after the traffic stop should have ended, and so he was unlawfully seized when it took place, which rendered any alleged "consent" void as a matter of law. In any event, he says, he did not actually consent to the search, and if his counsel had not been ineffective the court would have heard testimony to prove that point.

¶15 The disagreement between the State and Mr. Floyd is really quite narrow, although no less important for that. The parties agree that Mr. Floyd's expired tags provided a sufficient basis for Deputy Ruffalo to initiate the traffic stop. And Mr. Floyd did not contest an officer's authority to ask a driver to exit his vehicle during such an encounter. Nor did he offer any argument against an officer's authority to ask a lawfully-seized person to consent to a search. Their disagreement centers on where we draw the line separating traffic stops of acceptable duration from those that have been impermissibly extended. A motorist is lawfully seized during the proper duration of a traffic stop, but unlawfully seized if it lasts longer than necessary to complete the purpose of the

7

stop. So the location of the line is important because of the constitutional rights affected. As we discuss below, if Mr. Floyd was unlawfully seized when Deputy Ruffalo requested permission to search him, his "consent" would be constitutionally invalid, and the evidence discovered during the search would need to be suppressed.

¶16 Mr. Floyd says the court of appeals drew the line in the wrong place. He argues that when Deputy Ruffalo finished writing the citations, the Constitution permitted no further interaction between the two of them beyond Deputy Ruffalo explaining the citations and informing him he was free to go. So when Deputy Ruffalo instead asked him if he would consent to a search, Mr. Floyd says Deputy Ruffalo extended the traffic stop with no justifiable basis.

¶17 The State says the constitutionally-permissible duration of the traffic stop did not conclude before Deputy Ruffalo asked Mr. Floyd if he would consent to a search. Thus, as the fruit of a consensual search, the illegal drugs comprised proper evidence against Mr. Floyd. And even if Deputy Ruffalo extended the stop, the State says, the totality of the circumstances gave him reasonable suspicion to believe Mr. Floyd had committed, was committing, or was about to commit a crime.

¶18 Thus, our task is to espy the point at which the traffic stop should have ended and assess how the search related to that point. Because the purpose of the stop determines its proper scope, we must identify what an officer may lawfully do when detaining someone for a suspended vehicle registration.

8

See, e.g., <u>Rodriguez v. United States</u>, 575 U.S. ___, 135 S. Ct. 1609, 1614 (2015) ("the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'——to address the traffic violation that warranted the stop, . . . and attend to related safety concerns . . . . Authority for the seizure thus ends when tasks tied to the traffic infraction are——or reasonably should have been——completed." (internal citations omitted)).

A. Constitutional Implications Of Traffic Stops

¶19 We begin where we should, with the constitutional prohibitions against unreasonable searches and seizures. The Fourth Amendment to the United States Constitution says:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Its Wisconsin counterpart, found in Article I, section 11 of the Wisconsin Constitution,[4] is substantively identical, and we normally interpret it coextensively with the United States Supreme Court's interpretation of the Fourth Amendment. <u>See, e.g.</u>, <u>State v.</u>

---

[4] "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." Wis. Const. art. I, § 11.

9

Dumstrey, 2016 WI 3, ¶14, 366 Wis. 2d 64, 873 N.W.2d 502 (citing State v. Arias, 2008 WI 84, ¶20, 311 Wis. 2d 358, 752 N.W.2d 748).

¶20 It is an unremarkable truism that a traffic stop is a seizure within the meaning of our Constitutions. "'The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment.'" State v. Popke, 2009 WI 37, ¶11, 317 Wis. 2d 118, 765 N.W.2d 569 (citations and one set of quotations omitted). Reasonable suspicion that a driver is violating a traffic law is sufficient to initiate a traffic stop. State v. Houghton, 2015 WI 79, ¶30, 364 Wis. 2d 234, 868 N.W.2d 143 ("[R]easonable suspicion that a traffic law has been or is being violated is sufficient to justify all traffic stops."). Reasonable suspicion requires that "[t]he officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion of the stop." Popke, 317 Wis. 2d 118, ¶23 (two sets of quotation marks and citation omitted).

¶21 Traffic stops are meant to be brief interactions with law enforcement officers, and they may last no longer than required to address the circumstances that make them necessary. "A routine traffic stop . . . is a relatively brief encounter

10

and 'is more analogous to a so-called Terry[5] stop . . . than to a formal arrest.'" Knowles v. Iowa, 525 U.S. 113, 117 (quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)) (footnote added; second ellipses in Knowles; one set of quotation marks omitted). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" Rodriguez, 135 S. Ct. at 1614 (citation omitted; alteration in Rodriguez). "Authority for the seizure thus ends when tasks tied to the traffic infraction are——or reasonably should have been——completed." Id.

¶22 Thus, we draw the line between traffic stops of proper duration and those that extend into unconstitutional territory according to functional considerations. We assess those considerations in the context of the "totality of the circumstances." See, e.g., United States v. Everett, 601 F.3d 484, 493-94 (6th Cir. 2010). And while the temporal duration of the stop may inform those considerations, it is not in itself dispositive. See United States v. Sharpe, 470 U.S. 675, 686 ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."); see also United States v. Peralez, 526

_____

⁵ Terry v. Ohio, 392 U.S. 1 (1968).

11

F.3d 1115, 1119 (8th Cir. 2008) ("Whether a traffic stop 'is reasonable in length is a fact intensive question, and there is no _per se_ time limit on all traffic stops.'" (citation omitted)). Generally speaking, an officer is on the proper side of the line so long as the incidents necessary to carry out the purpose of the traffic stop have not been completed, and the officer has not unnecessarily delayed the performance of those incidents. See, e.g., Rodriguez, 135 S. Ct. at 1614-15 (explaining that authority for a traffic-stop based seizure ends when tasks related to the infraction are, or should have been, completed). He steps across that line (again speaking generally) when he maintains the seizure after he has completed all the necessary functions attendant on the traffic stop. See State v. Malone, 2004 WI 108, ¶26, 274 Wis. 2d 540, 683 N.W.2d 1 (a reasonable seizure can become unreasonable if the officer "extends the stop beyond the time necessary to fulfill the purpose of the stop." (citation omitted)).

¶23 Mr. Floyd's stop was not complicated—his vehicle's registration was suspended. Deputy Ruffalo then learned Mr. Floyd had neither insurance nor a valid driver's license. At a minimum, this authorized Deputy Ruffalo to take the time reasonably necessary to draft the appropriate citations and explain them to Mr. Floyd. See, e.g., Rodriguez, 135 S. Ct. at 1614 (explaining that in the traffic stop context, "addressing the infraction is the purpose of the stop . . . ."). Until that is done, and so long as Deputy Ruffalo does not unnecessarily delay the process, the permissible duration of the traffic stop

12

has not elapsed. Id. at 1615 ("The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" (quoting Arizona v. Johnson 555 U.S. 323, 333 (2009); alteration in Rodriguez)).

¶24 We note that before Deputy Ruffalo asked Mr. Floyd to consent to a search, he asked him to step out of his vehicle. During a valid traffic stop, this is a matter of no constitutional moment: "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Mimms, 434 U.S. at 111 n.6. In an area of the law where bright lines are rare, we have had no difficulty discerning one here. In State v. Johnson we recognized that Mimms "established a per se rule that an officer may order a person out of his or her vehicle incident to an otherwise valid stop for a traffic violation." 2007 WI 32, ¶23, 299 Wis. 2d 675, 729 N.W.2d 182.

¶25 That brings us to the nub of the dispute between the State and Mr. Floyd. After writing the citations, Deputy Ruffalo returned to Mr. Floyd's car and asked him if he would submit to a search. Mr. Floyd says this request extended the stop beyond its permissible duration. The only thing Deputy Ruffalo could lawfully do after writing the citations, Mr. Floyd says, was explain them to him and bid him good day.

¶26 Although Mr. Floyd's argument incorporates the principle that the "mission" of the traffic stop defines its

13

acceptable duration, he does not account for how the officer's safety fits within that mission. "Traffic stops are 'especially fraught with danger to police officers . . . .'" Rodriguez, 135 S. Ct. at 1616 (quoting Johnson, 555 U.S. at 330); see also Mimms, 434 U.S. at 110 ("We think it too plain for argument that the State's proffered justification——the safety of the officer—— is both legitimate and weighty."). That makes officer safety an integral part of every traffic stop's mission. Rodriguez, 135 S. Ct. at 1616 ("Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself.")

¶27 The danger inherent to traffic stops authorizes an officer "to take certain negligibly burdensome precautions in order to complete his mission safely." Id.; see also Mimms, 434 U.S. at 110-11 (discussing inherent risks a police officer faces during a traffic stop, such as assault by seated suspects and accidental injury from passing traffic, in concluding the request that a person exit the vehicle during a traffic stop is justifiable and de minimis); Johnson, 299 Wis. 2d 675, ¶¶25-27, (acknowledging "the serious risks law enforcement officers must undertake whenever they initiate contact with a suspect who is seated in a vehicle"). Thus, the questions to which Mr. Floyd objects are appropriate if they are negligibly burdensome precautions to ensure the officer's safety during the stop.

¶28 Deputy Ruffalo asked Mr. Floyd if he had any weapons or anything that could harm him. When Mr. Floyd said he didn't, Deputy Ruffalo asked if he could perform a search for his

14

safety. Both questions specifically related to the officer's safety. According to Mr. Floyd, however, the second question was not negligibly burdensome: "What the State entirely ignores is that unlike questions seeking information, a request to conduct a frisk involves 'a severe, though brief, intrusion upon cherished personal security . . . [that] must surely be an annoying, frightening, and perhaps humiliating experience.'" (Quoting Terry v. Ohio, 392 U.S. 1, 24-25 (1968)). While it is true that such a search can be all of that, a request to conduct such a search cannot. In fact, that request is just like "questions seeking information" because it is just seeking information——to wit, whether Mr. Floyd would agree to be searched. What follows the answer to the question may be a non-negligible burden, but that says nothing about the nature of the question itself. Mr. Floyd provided no other argument that the questions imposed a burden forbidden by Rodriguez, and nothing about them immediately suggests a disqualifying characteristic. Therefore, because the questions related to officer safety and were negligibly burdensome, they were part of the traffic stop's mission, and so did not cause an extension.[6]

---

[6] The dissent misreads our opinion with respect to whether Deputy Ruffalo extended the stop. It says:

> The majority concludes that the traffic stop was not extended because Mr. Floyd freely and voluntarily consented to the search. It then determines that there is no need to consider whether there was reasonable suspicion because it has already concluded that the traffic stop was not extended.

(continued)

15

B.  Constitutional Consent

¶29 Whatever additional time the actual search consumed, or the burden it imposed, is irrelevant so long as Mr. Floyd consented to it. Schneckloth v. Bustamonte, 412 U.S. 218, 242-43 (1973) ("While the Fourth and Fourteenth Amendments limit the circumstances under which the police can conduct a search, there is nothing constitutionally suspect in a person's voluntarily allowing a search."). When we inquire into the legitimate scope of a traffic stop's mission, its duration, and the burdensomeness of its incidents, we do so because these are nonconsensual aspects of the interaction between a citizen and a law enforcement officer. But when a person consents, the Fourth Amendment does not bar the search (so long as it does not exceed the scope of the person's consent). Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (explaining that although the Fourth Amendment generally prohibits warrantless searches, "[t]he prohibition does not apply . . . to situations in which

_____

Dissent, ¶46 (citation omitted).

Actually, our conclusion that Deputy Ruffalo did not extend the stop is based first and foremost on his interactions with Mr. Floyd before he consented to the search. But the dissent does not engage this part of our opinion at all. This is not a small oversight. Beginning with ¶15 and ending with this note, that has been the sole subject of our discussion. Measured by paragraphs, that's 48% of our opinion's entire analysis. The reason we didn't address "reasonable suspicion" is because that is necessary only if Deputy Ruffalo extended the stop. As the first half of our opinion demonstrates, he did not. As for the effect of Mr. Floyd's consent to the search, that is the topic of the next subpart.

16

voluntary consent has been obtained . . . ."); see also Schneckloth, 412 U.S. at 219 ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990) ("When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass."). Thus, we inquire now into whether Mr. Floyd provided constitutionally-valid consent to Deputy Ruffalo's search.

¶30 The circuit court found that after Deputy Ruffalo asked whether Mr. Floyd would consent to a search, Mr. Floyd said "yes, go ahead." This is an unequivocal assent, and so it is sufficient to authorize the search so long as Mr. Floyd's response was given "freely and voluntarily." Johnson, 299 Wis. 2d 675, ¶16 ("When the purported legality of a warrantless search is based on the consent of the defendant, that consent must be freely and voluntarily given."). The State bears the burden of establishing by clear and convincing evidence that a person's consent to a search was voluntary. State v. Phillips, 218 Wis. 2d 180, 197, 577 Wis. 2d 794 (1998). Generally, a response is voluntary if it "was given in the absence of duress or coercion, either express or implied." State v. Bons, 2007

WI App 124, ¶17, 301 Wis. 2d 227, 731 N.W.2d 367 (quoting Phillips, 218 Wis. 2d at 196). Relevant considerations include:

> [W]hether any misrepresentation, deception or trickery was used to persuade the defendant to consent; whether the defendant was threatened or physically intimidated; the conditions at the time the search was made; the defendant's response to the officer's request; the defendant's physical and emotional condition and prior experience with police; and whether the officers informed the individual that consent could be withheld.

Bons, 301 Wis. 2d 227, ¶17.

¶31 Mr. Floyd argued his "consent" was not valid because the circumstances demonstrate it was not voluntarily given. Specifically, he argued that because Deputy Ruffalo had not returned his identification card prior to asking whether he would consent to a search, his response could not be voluntary because he was unlawfully seized. He said "the record shows that Floyd's consent was not voluntary, where in the absence of any suspicion, the deputy withheld [his] documents to prevent the stop from terminating in order to procure [his] agreement to the pat-down." It is true that these facts can be useful in determining the voluntariness of someone's consent. But it is useful to a part of the analysis we have already resolved against Mr. Floyd's position. If an officer withholds a person's documents, there is good reason to believe the person was not "free to leave" at that time. That, in turn, helps us decide whether the person was seized. See, e.g., State v. Hogan, 2015 WI 76, ¶63, 364 Wis. 2d 167, 868 N.W.2d 124 ("a traffic stop ends when a reasonable person, under the totality

18

of the circumstances, would feel free to leave."). If the seizure is unlawful, the consent is invalid. See, e.g., State v. Jones, 2005 WI App 26, ¶9, 278 Wis. 2d 774, 693 N.W.2d 104 ("a search authorized by consent is wholly valid unless that consent is given while an individual is illegally seized." (citing State v. Williams, 2002 WI 94, ¶¶19-20, 255 Wis. 2d 1, 646 N.W.2d 834)); see also United States v. Jerez, 108 F.3d 684, 694-96 (7th Cir. 1997). Here, however, we have concluded the traffic stop was not extended and that Mr. Floyd was seized——lawfully——when Deputy Ruffalo requested his consent to the search.[7]

¶32 Requesting permission to search a person who has been lawfully seized does not invalidate the person's consent. See Schneckloth, 412 U.S. at 248-49 (consent given while seized pursuant to a traffic stop was constitutionally valid); United States v. Watson, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."). The routine act of retaining an identification card or driver's license during a

---

[7] The cases on which Mr. Floyd relies to invalidate his consent all address the effect of an illegal seizure on the voluntariness of the subject's consent. See Rodriguez v. United States, 575 U.S. ___, 135 S. Ct. 1609 (2015) (unlawful seizure because traffic stop impermissibly extended); State v. Hogan, 2015 WI 76, 364 Wis.2d 167, 868 N.W.2d 124 (illegal extension of traffic stop can negate consent to a search); State v. Luebeck, 2006 WI App 87, ¶17, 292 Wis. 2d 748, 715 N.W.2d 639 ("[C]onsent to search was tainted by the illegal seizure."). These cases have no instructive value here because Mr. Floyd's seizure was not unlawful.

19

traffic stop, without more, is insufficient evidence of the type of duress or coercion capable of making consent something less than voluntary. If it were otherwise, it would be virtually impossible to obtain consent to a search during a traffic stop. We see no authority to support such a proposition, and Mr. Floyd offers none. So retaining the identification card presented no structural impediment to Deputy Ruffalo's request for permission to perform a search; we continue with the inquiry into the voluntariness of Mr. Floyd's response.

¶33 The record does not indicate Deputy Ruffalo employed any misrepresentation, deception, or trickery in seeking Mr. Floyd's consent. There is likewise nothing in the record suggesting Deputy Ruffalo used any threats or physical intimidation of any type in seeking Mr. Floyd's consent. Deputy Ruffalo was the only officer conducting the search, there is no indication Mr. Floyd was handcuffed or that Deputy Ruffalo threatened to use them, there is no suggestion Deputy Ruffalo drew his weapon, and the traffic stop and search occurred during daylight hours with pedestrian and vehicular traffic nearby. As to the remaining factors we are to consider, there is no evidence regarding Mr. Floyd's physical or emotional condition at the time. Similarly, there is nothing in the record indicating Deputy Ruffalo informed Mr. Floyd he could withhold

consent, but this factor is not sufficient, in and of itself, to question the voluntariness of Mr. Floyd's consent.[8]

¶34 Under the totality of these circumstances, we conclude the search was constitutionally sound because Mr. Floyd freely and voluntarily consented to it. Deputy Ruffalo discovered the illegal drugs while conducting a lawful search, so there was no reason to suppress that evidence. Because we conclude Deputy Ruffalo did not extend the traffic stop, we do not address the State's alternative argument that Deputy Ruffalo had reasonable suspicion of illegal drug activity sufficient to support an extension.[9]

### C. Ineffective Assistance of Counsel

¶35 Mr. Floyd claims he received ineffective assistance of counsel because his trial counsel failed to call Officer White (the "cover" officer) as a witness at the suppression hearing. According to Mr. Floyd, Officer White's testimony would have

---

[8] Although this is a factor to consider, it is not a sine qua non to the voluntariness of a subject's consent to a search. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

[9] The dissent focuses on whether the circumstances of Mr. Floyd's stop were sufficient to create reasonable suspicion of criminal activity. But there is no reason at all to address this question unless Deputy Ruffalo extended the stop. The dissent says he did, and he did it by calling and waiting for a cover squad to arrive. Dissent, ¶80. But the dissent misses a critical part of the factual record. The uncontradicted facts show that the cover squad arrived while Deputy Ruffalo was still filling out the citations. So it is impossible for this to have extended the stop. Thus, the dissent lacks a raison d'être, and so we do not address it further.

21

revealed that Deputy Ruffalo did not ask Mr. Floyd for his consent to the search, but rather that he advised Mr. Floyd he was going to perform the search, thus rendering any consent involuntary. See Johnson, 299 Wis. 2d 675, ¶16 ("Acquiescence to an unlawful assertion of police authority is not equivalent to consent." (quoting State v. Wilson, 229 Wis. 2d 256, 269, 600 N.W.2d 14 (Ct. App. 1999))).

¶36 The Sixth Amendment[10] guarantees to a criminal defendant "the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984). We apply the two-prong Strickland test when assessing a claimed violation of that right. See, e.g., State v. Maday, 2017 WI 28, ¶54, 374 Wis. 2d 164, 892 N.W.2d 611. A successful attack on counsel's performance requires that the defendant establish both that trial counsel performed deficiently and that the deficiency was prejudicial. See State v. Pitsch, 124 Wis. 2d 628, 633, 369 N.W.2d 711 (1985); see also Strickland, 466 U.S. at 697.

¶37 The first prong requires us to compare counsel's performance to the "wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Only if his conduct falls outside that objectively reasonable range will we find deficient performance. State v. Thiel, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. To show prejudice (the second prong), a defendant must establish "a reasonable probability

---

[10] See U.S. Const. amend. VI; Wis. Const. art. I, § 7.

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Pitsch, 124 Wis. 2d at 642 (quoting Strickland, 466 U.S. at 694). If the defendant fails to prove one element, it is unnecessary to address the other. Strickland, 466 U.S. at 697.

¶38 Although trial counsel did not have Officer White testify at the suppression hearing, he did offer the essence of his story in his brief. Counsel juxtaposed Deputy Ruffalo's report that he asked Mr. Floyd if he would allow a search with Officer White's report that Mr. Floyd was told he would be searched:

> Deputy Ruffalo indicates he asked Mr. Floyd whether he had any weapons and if he could search Mr. Floyd for his (Deputy Ruffalo's) safety. Deputy Ruffalo indicates that Mr. Floyd stated, "yeah, go ahead." City of Racine Police Officer White (the cover officer) reports something slightly different in regards to the search. Officer White reports that after having Mr. Floyd exit the vehicle, Deputy Ruffalo told Mr. Floyd that before he could explain the citations he was going to pat down Mr. Floyd for weapons. Officer White indicates that after being told he was going to be searched, Mr. Floyd stated something similar to "go ahead."

The circuit court was not persuaded, instead finding as a factual matter that Deputy Ruffalo asked for Mr. Floyd's consent, and that Mr. Floyd consented.

¶39 At the postconviction hearing, Officer White reprised the contents of his report and offered some related commentary. He testified that, after arriving on the scene, he accompanied Deputy Ruffalo to Mr. Floyd's vehicle where Deputy Ruffalo asked Mr. Floyd to step outside. He then explained that "[Deputy]

23

Ruffalo, he -- he asked him if he could do an external pat down for weapons and which he consented." When asked whether this was consistent with the report's indication that Mr. Floyd had been "advised"[11] he would be searched, Officer White responded that Deputy Ruffalo "said he was going to pat him -- asked him to pat him down for weapons . . . . He asked him for the most part." He could not, however, remember the specific words Deputy Ruffalo used, explaining that a cover officer "can't always hear what's exactly going on between the officer and who they are making contact with" because the cover officer generally "kind of watch[es] who's driving the vehicle, you watch the passengers inside the vehicle." When asked whether he recalled Mr. Floyd's response to Deputy Ruffalo, he testified it was his recollection that Mr. Floyd said something along the lines of "go ahead."

¶40 Trial counsel also testified at the postconviction hearing. He said he included information about Officer White's incident report in the suppression motion but ultimately chose not to call him as a witness because he was "happy as far as how the evidence came out from the deputy, from Deputy Ruffalo, and that he did not have a basis to continue his stop of Mr. Floyd."

---

[11] The draft copy of Officer White's report in the Record uses the word "advised" in reference to the pre-search exchange between Deputy Ruffalo and Mr. Floyd; however, throughout his briefing, Mr. Floyd states the report indicated Deputy Ruffalo "told" Mr. Floyd he was going to perform a pat-down search. For the purpose of this opinion, we use "advised" and "told" interchangeably.

He was concerned Officer White's testimony would "potentially giv[e] additional information that potentially damaged where I thought I was." Counsel further explained he thought he was "doing pretty well" in terms of arguing Mr. Floyd could not voluntarily consent because he was illegally seized at the time Deputy Ruffalo requested consent. Although counsel could not recall whether he discussed the ultimate decision not to call Officer White with Mr. Floyd, he indicated it would have been his normal practice to do so.

¶41 At the conclusion of the hearing, the circuit court acknowledged "some dichotomy from [Officer] White's [incident] report . . . as to what it meant" in terms of Deputy Ruffalo's exchange with Mr. Floyd, but concluded that trial counsel's decision not to call Officer White was "his tactical approach; it was a reasonable approach . . . ." The circuit court also acknowledged that "[w]e know now after Mr. White testified that whatever [trial counsel] thought, [Officer] White would have corroborated [Deputy] Ruffalo's version to that extent."

¶42 Trial counsel's performance was not deficient. It was the State's burden to prove Mr. Floyd freely and voluntarily consented to a search. We recognize that Officer White's report created a potential ambiguity with Deputy Ruffalo's testimony, something Mr. Floyd's counsel ably (albeit unsuccessfully) exploited. And calling Officer White to the stand may have removed the potential ambiguity——but this was a task for the

25

State, if anyone. Mr. Floyd's counsel is not responsible for clarifying the State's evidence.[12] Indeed, had he done so, Mr. Floyd might now be arguing his counsel was deficient because he helped the State defeat his motion to suppress. We agree with the circuit court that trial counsel's decision not to call Officer White was a valid tactical choice and did not fall outside "the wide range of professionally competent assistance." See, e.g., State v. Felton, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983) (explaining that where "tactical or strategic decisions" are "based upon rationality founded on the facts and the law[,]" counsel will not be deemed to have provided ineffective assistance of counsel). Therefore, Mr. Floyd did not suffer ineffective assistance of counsel.

## IV. CONCLUSION

¶43 Deputy Ruffalo did not extend Mr. Floyd's traffic stop because the request to perform a search of his person was part of the stop's mission. Mr. Floyd was lawfully seized at the time of the request, and he provided his consent to the search freely and voluntarily. This constitutionally-valid search revealed illegal drugs in Mr. Floyd's possession, so the circuit court properly denied his motion to suppress. And because Mr.

---

[12] The seeming ambiguity created by Officer White's report favored Mr. Floyd's argument because it was the State's burden to demonstrate free and voluntary consent. If Mr. Floyd's counsel had called Officer White to the stand, the seeming ambiguity could have resolved against Mr. Floyd's position (as it eventually did). Mr. Floyd's counsel was not responsible for clarifying ambiguities that would assist the State's case.

Floyd's trial counsel did not perform deficiently with respect to Officer White's testimony, Mr. Floyd did not receive ineffective assistance of counsel. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶44 ANN WALSH BRADLEY, J. *(dissenting).* The court of appeals acknowledged that the question of reasonable suspicion here "is a very close call." State v. Floyd, 2016 WI App 64, ¶16, 371 Wis. 2d 404, 885 N.W.2d 165. I land on one side of the line and the court of appeals' decision falls on the other.

¶45 Rather than focus on the "close call" of reasonable suspicion, the majority avoids it entirely. Instead, it focuses primarily on the case specific fact of whether Floyd gave actual consent to the search. Majority op., ¶29 ("[W]hen a person consents, the Fourth Amendment does not bar the search . . . .").

¶46 The majority concludes that the traffic stop was not extended because Mr. Floyd freely and voluntarily consented to the search. Majority op., ¶34. It then determines that there is no need to consider whether there was reasonable suspicion because it has already concluded that the traffic stop was not extended. Id.

¶47 Yet, the strictures of the Fourth Amendment remain. If the stop was unlawfully extended, then the consent was likewise unlawful.

¶48 I write separately not merely because I disagree with the court of appeals as to where the line should be drawn under the facts of this case. Rather, I write also to express my concern that the majority opinion, in lockstep with this court's jurisprudence, continues the erosion of the Fourth Amendment. It is through such erosion that implicit bias and racial

1

profiling are able to seep through cracks in the Fourth Amendment's protections.

¶49 Because I conclude that the traffic stop was extended beyond what was reasonably necessary to complete its mission and because I determine that there was no articulable reasonable suspicion of additional illegal activity to otherwise justify the extension, I respectfully dissent.

I

¶50 The Fourth Amendment to the Unites States Constitution provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." As the United States Supreme Court has observed, "[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference by others, unless by clear and unquestionable authority of law." Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891).

¶51 Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of personal liberty interests. Ker v. State of Cal., 374 U.S. 23, 32 (1963). Indeed, the Fourth Amendment "is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted." Id. at 33 (quotations and citation omitted).

¶52 In this case, we address the Fourth Amendment's protection against unreasonable searches and seizures in the context of a traffic stop. "A routine traffic stop . . . is a relatively brief encounter and 'is more analogous to a so-called "Terry stop" . . . than to a formal arrest.'" Knowles v. Iowa, 525 U.S. 113, 117 (1998).

¶53 A Terry stop is a brief investigatory seizure of an individual based on an officer's reasonable and articulable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 20-21 (1968). Balancing public safety and personal liberty, the Terry court required that an investigative stop be based on "specific and articulable facts, which, taken together with rational inferences from those facts, warrant that intrusion." Id. at 21.

¶54 The Terry doctrine sprouted from the blatantly suspicious behavior of two would-be jewelry thieves. Id. at 5. Over the course of an afternoon, the defendants in Terry took turns walking past a jewelry store, peering inside, and then returning to their original spot on a nearby street corner. Id.

¶55 Based on this pattern of behavior and thirty years of experience detecting thievery in the neighborhood, the police officer in Terry suspected that the men were "casing" the store. Id. Believing that a "stick-up" was imminent and knowing that "American criminals have a long tradition of armed violence," the officer seized and searched the men. Id.

¶56 Given these particularized facts, the Terry court concluded that "where a police officer observes unusual conduct

3

which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search . . . ." Id. at 30. Under Terry, the inquiry focused on the officer's "reasonable fear for his own or others' safety" and allowed "a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id.

¶57 This court, in State v. McGill, 2000 WI 38, ¶21, 234 Wis. 2d 560, 609 N.W.2d 795, explained that "Terry does not . . . authorize officers to conduct a protective frisk as a part of every investigative encounter." Accordingly, "Terry limits the protective frisk to situations in which the officer is 'justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.'" Id. (citing Terry, 392 U.S. at 24).

¶58 In this case, we consider Terry in the context of a traffic stop. When a traffic stop concludes or is extended beyond what is reasonably necessary to complete its mission, continued seizure becomes unlawful. Illinois v. Caballes, 543 U.S. 405, 407 (2005); Rodriguez v. United States, 135 S. Ct. 1609, 1614-15 (2015). An officer may expand the scope of the inquiry "only to investigate 'additional suspicious factors [that] come to the officer's attention.'" State v. Hogan, 2015

4

WI 76, ¶35, 364 Wis. 2d 167, 868 N.W.2d 124 (quoting State v. Betow, 226 Wis. 2d 90, 94, 593 N.W.2d 499 (Ct. App. 1999)).

¶59 Like a Terry stop, the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's "mission," which is to address the traffic violation that warranted the stop and attend to related safety concerns. Rodriguez, 135 S. Ct. at 1614. On-scene investigation into other unrelated crimes deviates from the mission of the stop. Id. at 1616. "So too do safety precautions taken in order to facilitate such detours." Id.

¶60 Indeed, even a de minimus extension that is not made in furtherance of the mission of the traffic stop is an unlawful extension. Id. As the Rodriguez court explained, common seizure techniques may unlawfully extend a stop when they are employed for reasons beyond the scope of the original stop. Id.

¶61 Having set forth the law that is to guide our inquiry, I turn now to the facts of this case.

II

¶62 Deputy Ruffalo ran Floyd's license plate at a stoplight and discovered that the vehicle's registration was suspended for an emissions violation. During this initial contact, the deputy asked for Floyd's license and insurance information. Floyd did not have either, but provided a Wisconsin identification card. The deputy returned to his squad car and asked dispatch if a canine unit or "cover squad" was available while also processing citations for the registration, license, and insurance violations.

5

¶63 The dispatcher informed the officer that a canine unit was not available, but that a patrol officer would arrive to serve as a "cover squad." When the second officer arrived at the scene, the deputy explained that he wanted to have Floyd exit the car because he "had some indications that there might be some criminal activity going on in the vehicle as well as explain the citations to him."

¶64 After the second officer arrived, the deputy returned to Floyd's vehicle and asked him to get out of the car. Floyd complied and the deputy then asked him if he had any weapons. Floyd stated that he did not have any weapons. The deputy then either asked for Floyd's consent to conduct a weapons pat down or advised Floyd that he was going to conduct a weapons pat down.[1]

¶65 According to the deputy's testimony at the suppression hearing, he "assume[s] everybody has a weapon, everyone I come in contact with." He further testified that every time he asks a driver to step out of the vehicle, the first thing he does is ask if he can search them.

¶66 The deputy patted Floyd down and found a bag containing a small amount of marijuana and 15 pills of Vicodin. Floyd filed a motion to suppress this evidence, arguing that the

---

[1] Officer White, the second officer at the scene, wrote in his original report that Deputy Ruffalo "advised" Floyd that he would conduct a weapons search. He testified that his report was accurate, but later testified that the deputy asked Floyd's consent to conduct a search.

6

deputy illegally extended the stop and searched his person without his voluntary consent.

¶67 At the suppression hearing, the deputy testified that he had reasonable suspicion to request a canine unit and a backup officer based on the following factors:

- Floyd was from Kenosha, WI;

- Floyd was alone in his vehicle;

- The time of day (6:45 p.m. during the summer);

- Floyd was stopped in a high crime area;

- Floyd's car had air fresheners in every vent; and

- The vehicle's windows were tinted.

Relying on these factors as a basis for reasonable suspicion, the circuit court denied Floyd's motion to suppress.

### III

¶68 In applying the law to the above facts, I begin with an examination of whether there was reasonable and articulable suspicion as to whether criminal activity was afoot. I address next whether the traffic stop was extended beyond the scope of the mission.

¶69 I quickly dispatch with the first three factors proffered as support for reasonable suspicion because they border on the ridiculous. If residing in Kenosha can serve as a factor supporting reasonable suspicion that criminal activity is afoot, then lord help us (and Kenosha). Likewise, warnings should issue to all of those who drive alone in their vehicle, lest it serve as a basis for a traffic stop. Finally, the

7

assertion that the time of 6:45 p.m. during the summer can serve as a factor for reasonable suspicion is bewildering.

¶70 At the outset the first three factors fail because they are simply unpersuasive in fact. The next three factors fail because they are also unpersuasive under the law.

¶71 It is well established that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." United States v. Martinez-Fuerte, 428 U.S. 543, 560 (1976). Thus, "circumstances must not be so general that they risk sweeping into valid law-enforcement concerns persons on whom the requisite individualized suspicion has not focused." State v. Gordon, 2014 WI App 44, ¶12, 353 Wis. 2d 468, 846 N.W.2d 483.

¶72 This case raises concern regarding whether generic and innocent factors may support reasonable and articulable suspicion without the presence of particularized behaviors or characteristics. Take, for example, the fact that the deputy stopped Floyd in a high crime area. As this court has recognized, "many persons 'are forced to live in areas that have "high crime" rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas.'" State v. Morgan, 197 Wis. 2d 200, 212, 539 N.W.2d 887 (1995) (quoting People v. Bower, 597 P.2d 115, 119, (Cal. 1979)).

¶73 In Illinois v. Wardlow, the Unites States Supreme Court reasoned that "it was not merely respondent's presence in

8

an area of heavy narcotics trafficking that aroused the officers' suspicion but his unprovoked flight upon noticing the police." 528 U.S. 119, 124 (2000). It instructed that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Id. Importantly, the Wardlow court did not just consider the generic factor of the location of the stop, but also the defendant's individualized flight behavior supporting reasonable suspicion. Id.

¶74 Likewise, when considering the presence of "an unusual number" of air fresheners in a vehicle, this court determined that when "combined with other facts," this may raise suspicion and justify further inquiry. State v. Malone, 2004 WI 108, ¶36, 274 Wis. 2d 540, 683 N.W.2d 1. As in Wardlow, however, the other facts considered by the Malone court involved particularized conduct and circumstances.

¶75 When the defendants' vehicle in Malone was stopped for speeding, the occupants appeared nervous and gave inconsistent accounts of where they were going. Id., ¶¶36-39. Additionally, one occupant said that the group was en route to a rave party and that he was on probation for drug charges. Id.; see also Rodriguez, 135 S. Ct at 1622-23 (noting the presence of individualized circumstances in addition to air fresheners, such as driving onto the shoulder of the road, the nervousness of the passenger, and the passenger's improbable explanation of the travel itinerary).

9

¶76 Finally, legally tinted windows ought not be a factor when considering whether the totality of the circumstances support a finding of reasonable suspicion. See, e.g., United States v. Diaz, 977 F.2d 163, 165 n.5 (5th Cir. 1992). Indeed, tinted windows are the epitome of a generic and innocent factor. As the court of appeals acknowledged here, "a significant portion of the population purchases vehicles with tinted windows for completely lawful reasons, including a desire to protect the interior of the vehicle from the sun and for greater privacy of innocent occupants." Floyd, 371 Wis. 2d 404, ¶16 n.3. Although it may have been a relevant factor before tinted windows became commonplace, it no longer is today.[2]

¶77 Equally important to the factors that were present in this case (a high crime area, air fresheners, and tinted windows) are the factors that were absent. There is no evidence in the record that Floyd exhibited any particularized behaviors that factored into the totality of the circumstances here. Unlike in Wardlow and Malone, there is no testimony of flight or that Floyd was nervous or evasive. Indeed, Deputy Ruffalo

---

[2] In writing this footnote, I observe the ten vehicles parked outside the State Capitol Building beneath my chamber's window. They include a Volvo, Mercedes, Plymouth, Chrysler, Ford, Nissan, Hyundai, Lexus, Kia and Chevrolet. All of the vehicles, save the Nissan, have noticeably tinted windows. Indeed, all of the vehicles belong to elected public officials or their staff. Once upon a time, tinted windows may have been a useful factor to establish reasonable suspicion that criminal activity was afoot. Because of the omnipresence of legally tinted windows, that time has long since passed. For further details regarding what constitutes an illegally tinted window, see Wis. Admin. Code Trans. 305.32 and 305.34.

10

testified at the suppression hearing that Floyd was compliant and cooperative with his orders and that Floyd made no furtive movements at any point during the initial portion of the stop.

¶78 Ultimately, I part ways with the court of appeals because all of the factors relied upon by the deputy are either baseless or are generic and innocent factors. Additionally, the record in this case is devoid of any particularized conduct or circumstances that would support reasonable and articulable suspicion that criminal activity is afoot.

¶79 Absent such reasonable and articulable suspicion, the extension of the stop was unlawful. Pursuant to Rodriguez, "the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's 'mission,'" which is to address the traffic violation that warranted the stop and attend to related safety concerns. 135 S. Ct. at 1614. Neither calling dispatch for a canine unit nor calling and waiting for backup was done in furtherance of the mission of the stop. This began the stop's extension and set the stage for the later chronological delays of the exit order and request for consent to search.

¶80 Even a de minimus extension that is not made in furtherance of the mission of the traffic stop is an unlawful extension. Id. Not only was involving a second officer beyond the scope of the traffic stop, but the deputy specifically testified that he did not want to order Floyd out of his vehicle or request consent to search until after the "cover squad" had arrived. See id. (explaining that an investigation into other

crimes deviates from the mission of the stop, as do safety precautions taken in order to facilitate such detours). By the time that the deputy ordered Floyd out of his vehicle and reportedly requested consent to search, the scope of the stop had been extended beyond its original mission——to issue Floyd a citation for a suspended registration due to an emissions violation.

¶81 Contrary to the majority, I do not address the issue of whether Floyd voluntarily consented to the search. In fact, the majority's reliance on consent is misplaced. "Consent, even when voluntary, is not valid when obtained through exploitation of an illegal action by the police." Hogan, 364 Wis. 2d 167, ¶57. When consent to search is obtained after a Fourth Amendment violation, evidence seized as a result of that search "must be suppressed as 'fruit of the poisonous tree' unless the State can show a sufficient break in the causal chain between the illegality and the seizure of evidence." Id. (citation omitted). The State has made no such showing here.

¶82 In sum, I conclude that the traffic stop was extended beyond what was reasonably necessary to complete its mission. Further, I determine that there was no reasonable and articulable suspicion of additional illegal activity to otherwise justify the extension.

IV

¶83 I turn now to address my concerns about the erosion of the Fourth Amendment that may give rise to implicit bias and racial profiling.

12

A

¶84 We've come a long way since Terry v. Ohio, but we're headed in the wrong direction. Originally intended to prevent crime and protect officers through investigatory stops and protective frisks based on reasonable and articulable suspicion, Terry's legacy is becoming a progression of thinly veiled refusals to meaningfully check the exercise of police power.

¶85 The continual dilution of Terry has led this court far astray from individualized suspicion. The individualized facts in Terry stand in stark contrast to the generic and innocent factors present in this case. In Terry, the blatantly suspicious behavior of two would-be jewelry thieves supported reasonable suspicion after they spent an afternoon taking turns walking past a jewelry store and peering inside. Here, the traffic stop extension was justified not on the basis of any particularized behavior, but on factors that might be present in any case.

¶86 Although this court routinely pays homage to the importance of Fourth Amendment protections, it appears often to be only lip service. See, e.g., State v. Dumstrey, 2016 WI 3, ¶22, 366 Wis. 2d 64, 873 N.W.2d 502 ("[I]t is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (quotations and citations omitted); State v. Kozel, 2017 WI 3, ¶40 ("Virtually any intrusion[n] into the human body will work an invasion of cherished personal security that is subject to constitutional scrutiny.") (quotations and citations omitted).

¶87 In the last two terms, this court is batting nearly zero when it comes to upholding Fourth Amendment challenges in criminal cases. Even if the challenge initially meets with success, it ultimately loses because of an asserted subsequent consent, or community caretaker exception or inevitable discovery rule, or whatever.[3]

---

[3] Fourth Amendment challenges in criminal cases include: State v. Howes, 2017 WI 18, 373 Wis. 2d 468, 893 N.W.2d 812 (a warrantless blood draw was constitutional under the exigent circumstances exception); State v. Kozel, 2017 WI 3, 373 Wis. 2d 1, 889 N.W.2d 423 (a warrantless blood draw was lawful because the EMT who drew the blood was acting under a physician's direction, the blood was drawn in a constitutionally reasonable manner, and the defendant did not object to the blood draw); State v. Weber, 2016 WI 96, 372 Wis. 2d 202, 887 N.W.2d 554 (an officer's entry into the defendant's garage was constitutionally reasonable under the hot pursuit exception); State v. Jackson, 2016 WI 56, 369 Wis. 2d 673, 882 N.W.2d 422 (the inevitable discovery doctrine applied because those portions of the warrant affidavit that were not tainted established constitutionally sufficient probable cause to search the residence); State v. Parisi, 2016 WI 10, 367 Wis. 2d 1, 875 N.W.2d 619 (a warrantless blood draw was constitutional under the exigent circumstances exception); State v. Matalonis, 2016 WI 7, 366 Wis. 2d 443, 875 N.W.2d 567 (a warrantless search of a home was constitutional pursuant to the community caretaker exception); State v. Dumstrey, 2016 WI 3, 366 Wis. 2d 64, 873 N.W.2d 502 (the locked parking garage underneath the defendant's building was not curtilage and therefore the officer's warrantless entry before the seizure did not occur in a constitutionally protected area); State v. Iverson, 2015 WI 101, 365 Wis. 2d 302, 871 N.W.2d 661 (an officer may constitutionally conduct a traffic stop for non-traffic civil forfeitures that do not constitute crimes); but see State v. Blackman 2017 WI __, __ Wis. 2d __, __ N.W.2d __ (declining to apply the good faith exception to the exclusionary rule). For a more comprehensive history of this court's Fourth Amendment decisions, see http://www.scowstats.com/2015/06/22/how-effective-are-fourth-amendment-arguments-in-the-wisconsin-supreme-court/.

¶88 The Fourth Amendment's protections, particularly its warrant requirement, are not some left over relics of the 18th century. Rather, they are as vital today as when they were created. Yet, I have concerns that the Fourth Amendment's right of freedom from warrantless search and seizures has become a second class right, or worse, meaningless prose.

¶89 The Fourth Amendment is intended to provide a check on the unbridled exercise of police power. It grew out of a demand that search and seizure powers be restrained. The amendment presents a reasonable yet delicate balance between the exercise of police power against the exercise of personal liberty. Courts are imbued with the responsibility to oversee this balance and to provide this check——not a blank check.

B

¶90 Having addressed the erosion of the Fourth Amendment and the dilution of the Terry doctrine, I turn to the concern that this trajectory may be allowing implicit bias and racial profiling to seep through cracks in the Fourth Amendment's protections. Indeed, amicus in this case advances that the requirement that reasonable suspicion be supported by individualized, particularized circumstances discourages the use of generic and innocent factors. It contends that such factors perpetuate and magnify the effects of implicit racial bias.[4] As one commentator explained, Terry's focus on individualized facts can be viewed as a "commitment and promise to minority

---

[4] The Office of the Wisconsin State Public Defender filed a helpful amicus brief.

15

communities around the nation that the Supreme Court was seriously concerned about police practices which rode roughshod over individual rights." Gregory Howard Williams, The Supreme Court and Broken Promises: The Gradual but Continual Erosion of Terry v. Ohio, 34 Howard L. J. 567, 576 (1991).

¶91 In his concurring opinion in the court of appeals, Judge Reilly also raised the concern that the trajectory of our Fourth Amendment jurisprudence "has tacitly accepted the profiling of suspects in the application of our reasonable suspicion test." Floyd, 371 Wis. 2d 404, ¶29-30 (Reilly, J., concurring). He provided the following example:

> Applying the Floyd facts to the 'objectively reasonable suspicion' test dictates that a white, suburban, soccer mom from Kenosha, driving alone at 6:45 p.m. in the month of July near the S.C. Johnson plant in Racine, Wisconsin, with multiple air fresheners (perhaps to mask the smell of old happy meals, spilled milk, and soiled athletic gear), and tinted windows (to protect the privacy of her children) evidences reasonable suspicion that she is involved in drug-related criminal activity. Substitute young, black male for soccer mom in this hypothetical and we have the facts of this case.

Id. He further cautioned that:

> The issue is whether we as a judicial system have tacitly accepted, condoned, and blessed the profiling of our citizens by taking age and color of skin into the 'objectively reasonable suspicion test' in order to combat crime. An effective judicial system must be true to its ideals; ideals which rest upon the constitutional protection against unreasonable government searches and seizures regardless of age or skin color.

Id. I share Judge Reilly's concern and join in his caution.

16

¶92 For the reasons set forth above, I respectfully dissent.

¶93 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

17