STATE of Wisconsin,
Plaintiff-Respondent,

v.

Lewis O. FLOYD, Jr.,
Defendant-Appellant.†

Court of Appeals

*No. 2015AP1294–CR. Submitted on briefs February 25, 2016.
—Decided July 6, 2016.*

2016 WI App 64

† Petition for Review Filed.

404

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael G. Soukup* of *Law Office of Matthew S. Pinix, LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sandra L. Tarver*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Reilly, P.J., Gundrum and Hagedorn, JJ.

¶ 1. GUNDRUM, J. Lewis Floyd, Jr., appeals his judgment of conviction, arguing the circuit court erred in denying his motion to suppress evidence of illegal drugs discovered on him during a traffic stop. He contends the arresting deputy unlawfully (1) extended the stop beyond the time necessary to issue various citations and (2) searched Floyd's person without his voluntary consent.[1] Floyd also appeals the denial of his postconviction motion, asserting his trial counsel performed ineffectively by failing to call as a witness at the suppression hearing another officer at the scene to testify that the deputy did not *ask* Floyd if he could search him but *told* Floyd he was going to do so. Floyd contends that if this officer had been called to the stand, the circuit court would not have found Floyd's consent to the search to have been voluntary and the evidence of illegal drugs would have been suppressed. For the following reasons, we affirm.

---

[1] Floyd also contends the search of his person was unlawful because the deputy did not reasonably suspect he was armed and dangerous. Because we conclude Floyd voluntarily consented to the search, we need not address whether the search was valid on this additional basis. *See Hegwood v. Town of Eagle Zoning Bd. of Appeals*, 2013 WI App 118, ¶ 1 n.1, 351 Wis. 2d 196, 839 N.W.2d 111 (we need not address other issues when one is dispositive).

*Background*

¶ 2. Based upon evidence discovered during a traffic stop, the State charged Floyd with two counts of possession with intent to deliver a controlled substance, as second and subsequent offenses, and two related counts of bail jumping. Floyd moved to suppress the evidence. The Racine County Sheriff's deputy who conducted the traffic stop was the only witness to testify at the hearing on the motion, and his relevant testimony is as follows.

¶ 3. Around 6:45 p.m. on July 23, 2013, the deputy stopped Floyd's vehicle due to the registration being suspended. During the deputy's two-to-three-minute initial contact with Floyd, Floyd informed the deputy he had neither a driver's license nor insurance, but provided his Wisconsin identification card, from which the deputy eventually determined Floyd's address was in Kenosha. During this initial contact, the deputy also observed "air fresheners in every vent of the vehicle as well as hanging off the rear view mirror." Based on his six years of training and experience as a law enforcement officer—in which the majority of his duties for five and one-half years consisted of performing traffic stops—the deputy suspected "there might be some criminal activity going on in the vehicle" because "[u]sually the air fresheners or the amount of them are—is an agent that is used to mask the smell of narcotics." The deputy knew the area of the stop to be a "high crime area" with "large quantities" of drug and gang activity, and further suspected possible criminal activity because of the time of day, the windows of Floyd's vehicle were tinted, and Floyd was alone in the vehicle. There was both vehicular and pedestrian traffic in the area at the time of the stop.

¶ 4. After observing the air fresheners, the deputy returned to his squad and prepared three citations for Floyd related to the suspended registration and lack of insurance and a driver's license, and contacted dispatch to request a canine unit or alternatively a "cover" squad. No canine unit was available, but a City of Racine police officer was sent to the scene.

¶ 5. After about five or six minutes, the deputy reinitiated contact with Floyd. Still in possession of the three citations and Floyd's identification card, the deputy asked Floyd to exit the vehicle, which Floyd did, so that the deputy could explain the citations to him. According to the deputy, at that point Floyd was "not free to leave" because the deputy still had to explain the citations to him and return his identification. The deputy confirmed at the hearing that he could have explained the citations to Floyd while Floyd remained seated in the vehicle, however, he had Floyd exit the vehicle "to make sure that he did not drive away":

> I wanted to obviously make sure that he understood I was not going to allow him to drive away from the scene. He did not have a valid driver's license. Whether or not he needed a ride, I would give him a ride to somewhere, if he wanted to walk from there, but I was not going to allow him to drive away from the scene.

¶ 6. As Floyd exited the vehicle, the deputy asked him if he had "any weapons or anything on him that could hurt" the deputy, to which Floyd responded that he did not. The deputy "asked him then if I could search him for my safety and he said yes, go ahead." During the search, the deputy located illegal drugs that led to the charges in this case.

412

¶ 7. The circuit court found the deputy had observed air fresheners "all over the place," and in the deputy's experience "air fresheners are utilized by people with drugs to mask odors that the drugs may emit in a closed space." The court concluded the deputy had reasonable suspicion to extend the traffic stop beyond just addressing the citations because of the air fresheners, as well as "the tinted windows, the time of the day, that Mr. Floyd was alone in his vehicle, he's from Kenosha." The court further found that the deputy "[a]sked him to get out of the vehicle and Mr. Floyd in fact consented to a search of his person." Regarding the deputy having Floyd exit the vehicle, the court stated:

> Whether the purpose of getting Floyd out was to make sure he couldn't drive the vehicle away, clearly because he wasn't licensed or the vehicle wasn't registered, or whether he could have let Floyd sit in it and watched him or observed him for a period of time to make sure he didn't drive away, as you submit those sequences out, the second one is ridiculous. Officers should take the person out of the vehicle, should make him walk away, should not let the vehicle be driven.

The court denied Floyd's suppression motion.

¶ 8. Floyd subsequently entered a no-contest plea to one count of possession with intent to deliver a controlled substance, and the remaining three counts were dismissed and read in. After the circuit court sentenced Floyd, he filed a postconviction motion, asserting his trial counsel performed ineffectively by not calling as a witness at the suppression hearing the City of Racine police officer who arrived on the scene to provide "cover" for the deputy, because that officer would have presented testimony that the deputy did not "ask" Floyd if he could search him but "told" him

he was going to do so. The circuit court denied the motion. Floyd appeals the denial of his suppression and postconviction motions. Additional facts are included below as necessary.

*Discussion*

## I. Floyd's suppression motion

¶ 9. Floyd argues the circuit court erred in denying his suppression motion because (1) the deputy extended the traffic stop beyond what was necessary for the three citations he issued and also lacked reasonable suspicion of additional illegal activity to otherwise justify an extension and (2) the deputy's search of Floyd's person was unlawful because Floyd did not voluntarily consent to it. We conclude the circuit court properly denied Floyd's suppression motion because Floyd was being lawfully detained when the deputy asked to search him and Floyd voluntarily consented to the search.

■

¶ 10. "When we review a circuit court's ruling on a motion to suppress evidence, we apply the clearly erroneous standard to the circuit court's findings of fact. However, we review the circuit court's application of constitutional principles to the findings of fact de novo." *State v. Smiter*, 2011 WI App 15, ¶ 9, 331 Wis. 2d 431, 793 N.W.2d 920 (2010) (citations omitted).

 A. *Floyd was lawfully detained at the time of the search*

 *i. The traffic stop was not "extended"*

■

¶ 11. At the time the deputy asked Floyd for permission to search him, Floyd was still lawfully

detained pursuant to his violations for operating a motor vehicle with a suspended registration and without a driver's license or insurance. That part of this traffic stop had not concluded in that the deputy had yet to return Floyd's identification to him and issue and explain the three citations. The deputy properly could have explained the citations to Floyd either while Floyd was still seated in the vehicle or after asking Floyd to exit it. The deputy chose the latter.

¶ 12. The deputy's request that Floyd step out of the vehicle during the ongoing traffic stop was per se lawful. *See Pennsylvania v. Mimms*, 434 U.S. 106, 107, 109–10 (1977) (holding that even without suspicion of additional "foul play," officer properly ordered motorist out of vehicle for execution of traffic stop related to expired license plate) (per curiam); *State v. Johnson*, 2007 WI 32, ¶ 23, 299 Wis. 2d 675, 729 N.W.2d 182 (2007) (recognizing the "per se rule" of *Mimms* "that an officer may order a person out of his or her vehicle incident to an otherwise valid stop for a traffic violation"). That said, in this particular case, the deputy also knew that Floyd could not lawfully drive away in the vehicle after completion of the traffic stop due to the vehicle's suspended registration and Floyd's lack of a driver's license or insurance. For that additional reason, the deputy's request that Floyd step out of the vehicle in order for the deputy to issue and explain the citations to him was reasonable.

*ii. Even if the stop was "extended," the extension was lawful*

¶ 13. Even if the deputy "extended" the traffic stop beyond what was necessary to address the registration, driver's license, and insurance violations, such

415

extension was warranted, as the circuit court also concluded, because the deputy reasonably suspected criminal drug-related activity.

¶ 14. Reasonable suspicion exists if, under the totality of the circumstances, "the facts of the case would warrant a reasonable police officer, in light of his or her training and experience, to suspect that the individual has committed, was committing, or is about to commit a crime." *State v. Post*, 2007 WI 60, ¶ 13, 301 Wis. 2d 1, 733 N.W.2d 634. It must be based on more than an officer's "inchoate and unparticularized suspicion or 'hunch.' " *Id.*, ¶ 10 (citation omitted). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the additional intrusion caused by the extension of the stop. *See id.* (citation omitted); *see also State v. Betow*, 226 Wis. 2d 90, 94–95, 593 N.W.2d 499 (Ct. App. 1999). As our supreme court has explained:

> [S]uspicious conduct by its very nature is ambiguous, and the [principal] function of the investigative stop is to quickly resolve that ambiguity. Therefore, if any reasonable inference of wrongful conduct can be objectively discerned, notwithstanding the existence of other innocent inferences that could be drawn, the officers have the right to temporarily detain the individual for the purpose of inquiry.

*State v. Young*, 2006 WI 98, ¶ 21, 294 Wis. 2d 1, 717 N.W.2d 729 (quoting *State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990)) (alteration in *Young*).

¶ 15. The deputy in this case observed "air fresheners in every vent of the vehicle as well as hanging off the rear view mirror," and he found this "unusual." Based upon his training and experience, the deputy

was aware "air fresheners or the amount of them are—is an agent that is used to mask the smell of narcotics," and he suspected Floyd was involved with illegal drugs at that time. Additionally, the deputy was aware Floyd was operating his vehicle in a "high crime area" where "large quantities" of drug and gang activity occurs, and that Floyd's vehicle had tinted windows.[2]

¶ 16. In this case, the question of reasonable suspicion is a very close call. That said, we conclude the deputy's suspicion "there might be some criminal activity going on in the vehicle" was reasonable and warranted a brief extension of the traffic stop for further investigation. Having air fresheners positioned in every vent, in addition to hanging from the rearview mirror, is indeed "unusual," as the deputy testified, and, based on the deputy's experience, signaled the likelihood Floyd had illegal drugs in his vehicle for which he was attempting to "mask the smell." *See State v. Malone*, 2004 WI 108, ¶¶ 6, 36, 274 Wis. 2d 540, 683 N.W.2d 1 ("The presence of seven or eight air fresheners in a vehicle [in that case "hanging from the . . . rearview mirror"] occupied by three young men with an average age of 21 . . . raises suspicion and justifies reasonable inquiry."); *see also United States v. Branch*, 537 F.3d 328, 332, 338 (4th Cir. 2008) (quoting

---

[2] The deputy and the circuit court both indicated the deputy's suspicion was supported further by the time of day, approximately 6:45 p.m. on July 23, 2013, and the fact Floyd was alone in his vehicle. The court further suggested that the fact Floyd appeared to be from Kenosha also supported the deputy's suspicion. Neither the testimony nor the court's discussion of it suggests, and we are not able to independently discern, how these facts support the suspicion in this particular case that Floyd may have had illegal drugs in his vehicle at the time.

*United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004) (noting "several air fresheners" is a "commonly used [method] to mask the smell of narcotics"); *see generally, United States v. Goss*, 256 F. Appx. 122, 124 (9th Cir. 2007); *United States v. Alexander*, 589 F. Supp. 2d 777, 786 (E.D. Tex. 2008); *State v. Provet*, 706 S.E.2d 513, 519 n.4 (S.C. Ct. App. 2011), *aff'd*, 747 S.E. 453 (S.C. 2013); *Sims v. State*, 98 S.W.3d 292, 296 (Tex. Crim. App. 2003) (all noting as an important reasonable-suspicion consideration officer testimony that the presence of multiple and/or strangely placed air fresheners indicates a desire of vehicle occupants to mask the odor of illegal drugs). Additionally, Floyd was operating his vehicle, illegally, in an area with significant drug and gang activity. *See State v. Allen*, 226 Wis. 2d 66, 74, 593 N.W.2d 504 (Ct. App. 1999) (noting that where location of stop was known for "drug dealing, gangs, criminal activity and gunshots; the reputation of an area is another factor in the totality of the circumstances equation"). Further, tinted windows add to suspicion because they suggest a possible desire of the operator to conceal from outside observation persons, items or activity in the vehicle.[3] *See United States v. Quintana-Garcia*, 343 F.3d 1266, 1273–74 (10th Cir. 2003) (concluding reasonable suspicion for an investigatory stop existed in part because "[t]he vehicle also had tinted windows, favored by smugglers

---

[3] We fully recognize that a significant portion of the population purchases vehicles with tinted windows for completely lawful reasons, including a desire to protect the interior of the vehicle from the sun and for greater privacy of innocent occupants. That said, as noted, in light of Floyd's operation of the vehicle in a high-crime, high-drug-activity area, and with air fresheners positioned in every vent of the vehicle, the deputy's suspicion was understandably and reasonably increased by Floyd's operation of a vehicle with tinted windows.

for their capacity to conceal what is inside the vehicle. We have little trouble concluding [due to the tinted windows and other factors] that Defendant's vehicle could be seen by an experienced Border Patrol agent as an effective smuggling vessel."). Standing alone, these facts could be viewed as innocent; taken together however, they amounted to sufficient specific, articulable reasons for believing criminal activity might well be afoot and authorized the deputy "to temporarily detain [Floyd] for the purpose of inquiry." *See Young*, 294 Wis. 2d 1, ¶ 21; *State v. Waldner*, 206 Wis. 2d 51, 58–59, 556 N.W.2d 681 (1996) (stating "police officers are not required to rule out the possibility of innocent behavior before initiating a brief stop"; and a court must consider "the totality of the facts taken together," and "as [the facts] accumulate, reasonable inferences about the cumulative effect can be drawn" and give rise to "a reasonable suspicion that something unlawful might well be afoot").

¶ 17. In sum, at the time the deputy asked Floyd if he could search his person, the deputy had lawfully asked him to step from the vehicle and was lawfully detaining him on two independent grounds: (1) the traffic stop related to the registration, driver's license, and insurance violations was still properly ongoing and (2) the deputy had reasonable suspicion illegal drug activity might well be afoot.

B. *Floyd voluntarily consented to the search of his person*

▬▬▬▬

¶ 18. The State must demonstrate by clear and convincing evidence that a person's consent to a search was voluntarily given. *State v. Bons*, 2007 WI App 124, ¶ 17, 301 Wis. 2d 227, 731 N.W.2d 367 (citing *State v.*

*Phillips*, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998)). To determine if consent was voluntary, we must consider whether it "was given in the absence of duress or coercion, either express or implied." *Id.* (citing *Phillips*, 218 Wis. 2d at 196). Relevant considerations include:

> [W]hether any misrepresentation, deception or trickery was used to persuade the defendant to consent; whether the defendant was threatened or physically intimidated; the conditions at the time the search was made; the defendant's response to the officer's request; the defendant's physical and emotional condition and prior experience with police; and whether the officers informed the individual that consent could be withheld.

*Id.* The relevant facts in this case are undisputed. Whether those facts demonstrate Floyd's consent was voluntarily given is a question of law we review de novo. *State v. Hartwig*, 2007 WI App 160, ¶ 7, 302 Wis. 2d 678, 735 N.W.2d 597.

¶ 19. Here, there is no suggestion the deputy utilized misrepresentation, deception or trickery to persuade Floyd to consent to the search of his person. Nor would a reasonable person in Floyd's position have felt threatened or physically intimidated: only the Racine police officer joined the deputy at the scene, serving as "cover" for the deputy; there is no evidence either officer drew a weapon or threatened Floyd in any way; Floyd was not handcuffed at the time of the search request; and the traffic stop was performed during the early evening in July, when it would have been light outside, with both pedestrian and vehicular traffic in the area. The circuit court found the deputy did not delay in preparing the citations. Floyd does not

challenge this finding and we see no error in it. When
the deputy asked Floyd if he could search Floyd for the
deputy's safety, Floyd responded, "yes, go ahead." We
hesitate to deduce too much from this response with-
out specifically related findings by the circuit court;
however, the question and response at least seem to
indicate the atmosphere surrounding the encounter
between the deputy and Floyd was not hostile at the
time of the deputy's search request. While there is no
evidence the deputy specifically informed Floyd he
could withhold his consent to the search, there is also
no evidence suggesting Floyd's physical or emotional
condition was such that he was not able to either freely
assent to or refuse the search. Relatedly, there is no
suggestion in the record Floyd was under the influence
of an intoxicant or did not understand the deputy's
request to search him. We conclude the totality of the
circumstances were such that Floyd would have felt
free to decline the deputy's request to search his
person; yet, he did not. His consent to the search was
voluntary.

¶ 20. Because the deputy was lawfully detaining
Floyd when he asked Floyd for permission to search
his person and Floyd voluntarily consented to the
search, the circuit court did not err in denying Floyd's
motion to suppress.

## II. Floyd's postconviction motion

¶ 21. Floyd also challenges the circuit court's
denial of his postconviction motion in which he con-
tended his trial counsel performed ineffectively when
counsel "failed to present evidence [at the suppression
hearing] that [the deputy] did not *ask* Floyd if he could

be patted down, but that he *told* Floyd he was going to do so." (Emphasis added.) Floyd asserts that if counsel had called as a witness at the suppression hearing the Racine police officer who provided "cover" for the deputy, Floyd's consent to the search would not have been found voluntary and the evidence of illegal drugs the deputy discovered on him would have been suppressed. We conclude counsel did not perform ineffectively.

¶ 22. To prove ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *See State v. Pitsch*, 124 Wis. 2d 628, 633, 369 N.W.2d 711 (1985); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the defendant fails to prove either prong, we need not address whether the other prong was satisfied. *See Strickland*, 466 U.S. at 697. To prove deficient performance, a defendant must show that counsel's specific acts or omissions were "outside the wide range of professionally competent assistance." *See id.* at 690. To show prejudice, the complaining party must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Pitsch*, 124 Wis. 2d at 642 (quoting *Strickland*, 466 U.S. at 694).

¶ 23. A determination regarding the effectiveness of counsel involves a mixed question of fact and law. *See id.* at 633–34. We will uphold factual determinations of the circuit court unless they are clearly erroneous; however, whether trial counsel's performance was deficient and prejudiced the defendant are questions of law we review de novo. *See id.* at 634.

422

Here, we affirm the circuit court because Floyd has not demonstrated a reasonable probability the results of the suppression hearing would have been different if trial counsel had called the Racine police officer as a witness.

¶ 24. Floyd included the officer's incident report with his postconviction motion. In that report, the officer wrote that the deputy "advised Floyd that before he explained the citations to him that he was going pat him down for weapons" and Floyd "consented to the search, saying something along the line of, 'Go ahead.' " In an apparent attempt at the postconviction hearing to show that the deputy *told* Floyd he was going to search him, rather than *asked* Floyd if he could do so, Floyd's postconviction counsel asked the officer what he observed after the deputy asked Floyd to exit his vehicle. The officer, however, responded with "[o]nce Floyd . . . exited the vehicle, [the deputy] . . . *asked* him if he could do an external pat down for weapons and [Floyd] consented." (Emphasis added.) A few questions later, postconviction counsel showed the officer his incident report and called the officer's attention to the second paragraph on the second page:

[Postconviction counsel]: The second paragraph.

It indicates—well, how did [the deputy] ask Mr. Floyd if he could do a pat down? Do you recall?

[Officer]: Oh, I believe he was—I think he just asked him if he could—he was like, Do you mind if I pat you down? That kind of thing.

. . . .

[Postconviction counsel]: ... I'd call your attention to the second paragraph again. It indicates that [the

423

deputy] advised Floyd that before he explained the citations to him that he was going to pat him down for weapons.

So is that not accurate?

[Officer]: Yeah, he asked him to exit the vehicle. Then he—he said he was going to pat him—asked him to pat him down for weapons, then explained the citations.

[Postconviction counsel]: I guess I'm trying to find out did he ask him or tell Floyd he was going to pat him down?

[Officer]: He asked him for the most part.

[Postconviction counsel]: So that would be contrary to what you wrote in your report that before he explained the citations he was going to pat him down?

[Officer]: Um, give me one second.

(Short pause.)

[Officer]: Yeah, the way that I have it written it just says that he advised him that he's gonna pat him down before explaining the citations.

[Postconviction counsel]: And is this report accurate?

[Officer]: To the best of my knowledge I want to say yeah.

¶ 25. On cross-examination by the State, the officer testified he did not have a clear recollection of the words the deputy used in his discussion with Floyd regarding the search, indicating that when serving as a cover officer, he "can't always hear what's exactly going on between the [primary] officer and who they are making contact with." Testimony proceeded:

[State]: In your report you indicated that Mr. Floyd consented to the search saying something along the lines of go ahead. Is that your recollection as well?

[Officer]: That is my recollection.

[State]: So that makes it sound like [the deputy] asked for permission to search and Mr. Floyd said go ahead.

[Officer]: Yes.

¶ 26. Following testimony, the circuit court recognized "some dichotomy from [the officer's incident] report . . . as to what it meant," but also noted the officer's testimony that "he didn't really hear what was going on." The court ultimately concluded, as it did at the suppression hearing, that Floyd voluntarily consented to the search of his person. The court stated that the deputy "asked him . . . if he could search him for officer safety, for weapons," "the search was appropriately conducted under all of the circumstances," and Floyd gave his consent for the search.

¶ 27. We do not believe there is a reasonable probability the result of the suppression hearing would have been any different if the officer had been called as a witness. After hearing the officer's postconviction testimony, the court again found that the deputy did not *tell* Floyd he was going to search him but instead *asked* Floyd if he could do so. We cannot say, based upon the officer's postconviction hearing testimony, that this finding was clearly erroneous, and this finding supports the court's ultimate conclusion that Floyd voluntarily consented to the search of his person. Floyd has failed to establish he was prejudiced by his trial counsel's failure to call the officer as a witness at the suppression hearing, and we find no error in the court's denial of his postconviction motion.

425

*By the Court.*—Judgment and order affirmed.

¶ 28 REILLY, P.J. (*concurring*). As an error correcting court, I support the well-written majority opinion given the law we are obligated to follow. When the law we are obligated to follow, however, justifies improper means to accomplish the ends of criminal detection—we fail.

¶ 29. I agree that Floyd was legally seized when he was stopped due to his vehicle registration being suspended. I agree that the current state of case law referenced by the majority opinion supports the finding of reasonable suspicion for drug-related activity. Majority, ¶ 16. I write separately to address my concern that our jurisprudence has tacitly accepted the profiling of suspects in the application of our reasonable suspicion test. In my opinion, the Fourth Amendment's "objectively reasonable suspicion" test has become meaningless as evidenced by the following example.

¶ 30. Applying the Floyd facts to the "objectively reasonable suspicion" test dictates that a white, suburban, soccer mom from Kenosha, driving alone at 6:45 p.m. in the month of July near the S.C. Johnson plant in Racine, Wisconsin, with multiple air fresheners (perhaps to mask the smell of old happy meals, spilled milk, and soiled athletic gear), and tinted windows (to protect the privacy of her children) evidences reasonable suspicion that she is involved in drug-related criminal activity. Substitute young, black male for soccer mom in this hypothetical and we have the facts of this case.

¶ 31. The issue is whether we as a judicial system have tacitly accepted, condoned, and blessed the profiling of our citizens by taking age and color of skin

into the "objectively reasonable suspicion" test in order to combat crime. An effective judicial system must be true to its ideals; ideals which rest upon the constitutional protection against unreasonable government searches and seizures regardless of age or skin color.