COURT OF APPEALS
DECISION
DATED AND FILED

January 14, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1361-CR**

Cir. Ct. No. 2017CF102

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

TYLER N. THOMPSON,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Polk County: DANIEL J. TOLAN, Judge. *Reversed and cause remanded with directions*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Tyler Thompson appeals a judgment of conviction for possession of tetrahydrocannabinols (THC) as a second or subsequent offense

and for possession of drug paraphernalia. The convictions resulted from Thompson's pleas following the denial of his suppression motion. Thompson contends the circuit court erred by denying his motion. Specifically, he argues police officers unreasonably extended his traffic stop for a minor traffic offense in order to conduct a drug investigation without having reasonable suspicion to do so, thus violating his constitutional right against unreasonable seizures.

¶2 We conclude the officers extended the stop beyond the time necessary to address a relatively minor traffic infraction—i.e., failing to stop completely at a stop sign. We also conclude the extension of the traffic stop was not independently supported by reasonable suspicion that Thompson was engaged in a drug offense. Consequently, we reverse the judgment of conviction and remand with directions that the circuit court grant Thompson's suppression motion.

**BACKGROUND**

¶3 Thompson was charged with possession of THC, methamphetamine, and drug paraphernalia, following the discovery of contraband in his vehicle after a traffic stop. Thompson filed a motion to suppress, alleging the police officers had unlawfully extended the traffic stop beyond the time necessary to address the traffic violation, leading to Thompson's confession and the eventual discovery of the contraband. The court held an evidentiary hearing on the motion, at which officers Del Stone and Anthony Puetz testified.

¶4 Stone testified he was monitoring a "residence suspected in dealing narcotics" just after midnight on March 5, 2017. Another officer had requested that Stone observe the residence and "try to conduct traffic stops in the area of that location." A few minutes after midnight, Stone saw the headlights of a full-size

2

pickup truck in the driveway activated. The pickup truck, which had several items in its exposed bed, left the driveway and headed south, then turned eastbound on Round Lake Road. Stone ran the truck's registration, which was current and registered to a location in Grantsburg, Wisconsin.

¶5 Stone witnessed the truck fail to make a complete stop at the intersection of Round Lake Road and County Highway D. Stone continued to follow the vehicle for a time, as he did not want to stop it near the residence in which drug dealing was suspected. After traveling a sufficient distance from the residence, he performed a traffic stop. Stone approached and saw the driver, whom he identified as Thompson, as well as another male in the front passenger seat. Stone testified Thompson was "extremely nervous" and his hands shook when he attempted to retrieve his driver's license from his wallet.

¶6 Stone informed Thompson of the reason for the stop, and Thompson was adamant that he came to a complete stop. Eventually Stone told Thompson he "didn't think that was a very big issue." Thompson volunteered that his plates were valid even though they did not display the current registration sticker, and Stone responded that he had already run the plates and knew the registration was current. Stone then asked Thompson from where he was coming and where he was going. Thompson stated he was coming from a residence on Round Lake Road. He told Stone he was not sure which residence, and he also stated he did not know anyone that was there. Thompson told Stone that he was there helping a friend named Sheyanne Whitaker move, and that the items in his truck bed were to be put in storage. Thompson stated the storage space was at his residence in Clam Falls, Wisconsin.

¶7     Stone then asked about Thompson's residence. Thompson stated he lived next to a former deputy sheriff, Tamara Larson, whom Stone generally knew. Stone told Thompson that he was traveling in the opposite direction of Clam Falls. Stone then returned to his vehicle to run a criminal history check on the two individuals in the vehicle. At some point, Stone also ran a record check on Sheyanne Whitaker, but he could not find any record for a person by that name.

¶8     Officer Puetz, who had heard Stone call out the traffic stop, arrived on the scene while Stone was in his vehicle. Stone exited his vehicle and told Puetz that the driver was extremely nervous. Stone testified that he told Puetz he had "reasonable suspicion that there [were] narcotics in the vehicle and that [he] would be asking Mr. Thompson for consent to search the vehicle and likely using [his] K9 to sniff the area around the vehicle."[1] Stone then returned to his squad. Puetz testified Stone was "doing … stuff in his squad. Talking to dispatch, whatever."

¶9     After speaking with Stone, Puetz approached Thompson. He asked Thompson to step out of his vehicle and asked him about where he was going. Thompson explained he was lost and had turned the wrong way, going south instead of north. Within the first one to two minutes of this conversation, Puetz informed Thompson that police were investigating suspected drug activity in the area. Thompson and Puetz then engaged in a discussion that lasted "quite a while," and included Thompson describing what he did for a living. After this "lengthy conversation," Puetz told Thompson he believed Stone was planning on running Stone's dog around Thompson's car. Thompson then admitted that he

---

[1] Stone had his canine present in his vehicle.

4

had "a half ounce" in his car, which Puetz understood to mean marijuana.[2] Thompson told Puetz where the marijuana and his pipe were located in the car. Puetz testified Thompson was cooperative throughout the process, although the officers also found methamphetamine that Thompson had not disclosed. At no time during Puetz's interaction with Thompson did he ask Thompson about the failure to stop.

¶10    Stone could not recall exactly how long the traffic stop took from the time of the stop until Puetz began searching the vehicle. He believed he had detained Thompson for ten to fifteen minutes before Puetz arrived. During the stop, Stone never observed any contraband or smelled the odor of marijuana or other controlled substances. Stone testified Thompson also did not appear to be under the influence of any controlled substances. After the search, Stone issued a verbal warning for the failure to stop.

¶11    The circuit court denied the suppression motion following briefing. The court declined to specifically find any facts, noting the parties' briefing had indicated agreement on the relevant facts.[3] The court determined the initial traffic stop was lawful, and it viewed the relevant question as whether the information obtained after the stop created "independent, reasonable, articulable facts that criminal activity was afoot to change the direction of the investigation" from a traffic stop to a narcotics investigation. The court found that the totality of the circumstances—including the fact that Thompson's vehicle had been located at a

---

[2] Stone had earlier told Thompson that he "was a K9 handler and was in the area attempting to make stops and encounter narcotics."

[3] We, too, treat the facts testified to by the officers as undisputed for purposes of this appeal.

suspected drug house, the late hour, Thompson's nervousness, his direction of travel, and his unverifiable story—supported the extension of the stop to investigate potential criminal activity.

¶12 After the denial of his suppression motion, Thompson reached a plea agreement with the State. He pleaded guilty to the possession of THC and drug paraphernalia charges, and the possession of methamphetamine charge was dismissed outright. The court withheld sentence on the THC charge and placed Thompson on eighteen months' probation; on the drug paraphernalia charge, the court imposed and stayed a thirty-day jail sentence and placed Thompson on probation for one year concurrent with the THC charge. Thompson now appeals, challenging the denial of his suppression motion. *See* WIS. STAT. § 971.31(10) (2017-18).[4]

## DISCUSSION

¶13 The Fourth Amendment to the United States Constitution prohibits unreasonable seizures.[5] *State v. Wright*, 2019 WI 45, ¶23, 386 Wis. 2d 495, 926 N.W.2d 157. This proscription applies to traffic stops, which are considered seizures for constitutional purposes. *Id.* A routine traffic stop is justified by reasonable suspicion that a traffic law has been or is being violated. *State v. Houghton*, 2015 WI 79, ¶30, 364 Wis. 2d 234, 868 N.W.2d 143.

---

[4] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[5] The Wisconsin Constitution contains substantively identical protections that are usually interpreted coextensively with the United States Supreme Court's interpretation of the Fourth Amendment. *State v. Floyd*, 2017 WI 78, ¶19, 377 Wis. 2d 394, 898 N.W.2d 560.

¶14     Here, it is undisputed Stone had reasonable suspicion to initiate the traffic stop in the first instance based on Thompson's failure to stop completely at the stop sign.  Thompson contends the traffic stop became illegitimate (and his admissions and the physical evidence derived therefrom should be suppressed) because the officers extended its duration to conduct a drug investigation. Whether evidence should be suppressed is a question of constitutional fact.  *State v. Floyd*, 2017 WI 78, ¶11, 377 Wis. 2d 394, 898 N.W.2d 560.  We review the circuit court's findings of historical fact under the clearly erroneous standard, but we independently apply those facts to the relevant constitutional principles.  *Id.*

¶15     The permissible duration of a traffic stop depends upon the purpose for the stop.  *Wright*, 386 Wis. 2d 495, ¶23; *see also* *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).  The stop may last no longer than is necessary to address the traffic violation that warranted the stop and to attend to related safety concerns.  *Rodriguez*, 575 U.S. at 354.  Certain ancillary investigations may be permissible as long as they do not lengthen the roadside detention beyond what is necessary to address the immediate violation.  *Id.* (citing *Arizona v. Johnson*, 555 U.S. 323, 327-28 (2009); *Illinois v. Caballes*, 543 U.S. 405, 406 (2005)).

¶16     Notably, the Supreme Court has held that during a traffic stop, an officer may make ordinary inquiries incident to the stop, beyond determining whether to issue a traffic ticket.  *Rodriguez*, 575 U.S. at 355.  These inquiries generally include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.*  Such ordinary inquiries parallel the objectives of enforcing the traffic code; they ensure that vehicles on the road are operated lawfully, safely and responsibly.  *Id.*

¶17 In summary, then, the mission of a traffic stop includes: (1) addressing the traffic violation that warranted the stop; (2) conducting ordinary inquiries incident to the stop, such as checking the driver's license; and (3) taking "negligibly burdensome precautions to ensure officer safety." *Wright*, 386 Wis. 2d 495, ¶9. "Authority for the seizure ends when these tasks are, or reasonably should have been, completed." *Id.* Additional investigative measures may be undertaken by officers as long as such unrelated inquiries do not measurably extend the duration of the stop. *Id.*, ¶10.

¶18 Thompson notes that, almost immediately, Stone diverted from the initial mission of addressing the traffic violation to asking questions designed to ascertain Thompson's involvement in suspected narcotics offenses. While such questions are not "routine" to a standard traffic stop (especially one involving an unlawful rolling stop)—and therefore tend toward showing an unreasonable prolonging of the stop—Thompson's arguments in this regard are slightly misdirected, as a pretextual seizure is not per se invalid. *See State v. Newer*, 2007 WI App 236, ¶4 n.2, 306 Wis. 2d 193, 742 N.W.2d 923 (noting an officer's subjective motivations for a stop are irrelevant as long as there were facts that would give rise to reasonable suspicion). Rather, the relevant question is whether the stop for a minor traffic infraction was unreasonably extended to pursue the parallel drug investigation.

¶19 As Thompson concedes, the initial stop was entirely valid, as was Stone's request for Thompson to produce a driver's license. Additionally, we consider Stone's initial inquiries permissible under the existing case law. These inquiries included asking Thompson where he had come from and where he was going, the location of his residence, and the name of the friend whom Thompson was helping move. *See State v. Betow*, 226 Wis. 2d 90, 93, 593 N.W.2d 499

(Ct. App. 1999) ("[O]nce stopped, the driver may be asked questions reasonably related to the nature of the stop—including his or her destination and purpose."). Stone's decision to return to his vehicle to run criminal background checks on the vehicle's occupants also was within the scope of the traffic stop for Thompson's failure to stop at the stop sign.[6] *See Rodriguez*, 575 U.S. at 355 (noting that warrant checks are permissible).

¶20    The stop became problematic during the time after Stone returned to his squad. Stone had already checked the vehicle's registration prior to the stop and had confirmed it was current despite the lack of that year's registration sticker on the license plate. Given that Stone issued only a verbal warning to Thompson for a failure to stop at the conclusion of the incident, he apparently did not intend to write Thompson a citation for that offense, and Stone never testified as to any such intent. Thus, the only apparent tasks Stone had to complete in his squad were to run criminal background checks on the vehicle's two occupants and attempt a records search on the friend Thompson said he was helping to move.

¶21    Puetz arrived while Stone was in his squad, after Thompson had already been stopped for approximately ten to fifteen minutes. By this point, the

---

[6] The complaint states that Stone observed a firearm case in the truck, and that Thompson had told Stone it contained his daughter's gun. There was no testimony elicited at the suppression hearing regarding the firearm, nor does the State directly argue that officer safety was a motivating factor for any of Stone's or Puetz's conduct.

The Supreme Court of Wisconsin recently granted a petition for review in *State v. Brown*, 2019 WI App 34, 388 Wis. 2d 161, 931 N.W.2d 890. That case involved a request during a traffic stop that the defendant exit his vehicle and consent to a search of his person. *Id.*, ¶¶6-9. Based upon our review of the court of appeals' opinion in *Brown*, it does not appear any opinion by the supreme court in that case is likely to impact the issues here, which relate to an extension of a traffic stop to conduct a drug investigation as opposed to efforts to ensure officer safety.

undisputed testimony was that Stone had already decided he had reasonable suspicion to conduct a dog sniff around the vehicle. After speaking with Puetz, Stone returned to his vehicle to perform additional, unidentified work; Puetz could say only that Stone was doing "stuff in his squad," like "[t]alking to dispatch." Stone never explained what other work he was doing during that time.

¶22 Puetz, for his part, testified that after he approached Thompson and asked him to step out of the vehicle, he engaged Thompson in a "fairly lengthy conversation." Puetz elaborated, "So, I mean, he told me about what he does for a living and, I mean, we talked for quite a while so -- and I haven't relayed everything he told me for sure." This lengthy conversation occurred prior to the time when Puetz told Thompson that Stone was planning to conduct a dog sniff, and while Stone was still in his squad, performing unspecified tasks.

¶23 We conclude that the undisputed facts available in this case show the officers extended the stop for a minor traffic infraction beyond its permissible duration to conduct a narcotics investigation. In this regard, it is notable that Stone told Thompson he did not believe Thompson's failure to stop was a "very big issue." Given the totality of the circumstances here, the detention ranged beyond the length necessary to address a minor moving violation, and indeed the officers appeared to have been ready to prolong the stop even longer but for Thompson's admission to possessing marijuana and related contraband.

¶24 The State's arguments to the contrary are unconvincing. First, the State argues that further investigation was necessary because Thompson gave "confusing, incomplete, and evasive answers" to Stone's questions regarding his purpose and travel itinerary. Again, we agree that Stone was justified in asking Thompson follow-up questions on those issues if he found Thompson's answers

unsatisfactory or incomplete. He was also justified in running a criminal records check on the vehicle's occupants. But an officer must "diligently pursue[]" these lines of inquiry so as not to unjustifiably deprive the person of his or her liberty beyond the time necessary to effectuate the purposes of the stop. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Diligence is gauged by what the officer actually did and how he or she did it. *Rodriguez*, 575 U.S. at 357.

¶25 Importantly, there is no account in the record of why the brief follow-up questioning and two criminal background checks required ten to fifteen minutes to complete before Puetz arrived *plus* the time in which Puetz engaged Thompson in a "lengthy conversation." The State vaguely represents that after Puetz arrived, Stone was "finishing up in his squad car" and at that time was "attending to the incidents related to the mission of the stop." The pages of the hearing transcript cited by the State in support of these representations contain only Puetz's suppositions about what Stone was doing in the squad. And even those suppositions lack any sort of specificity; Puetz could only offer that Stone was "doing … stuff in his squad" and that, a few minutes after Thompson confessed, Stone "got done with whatever he was doing." The circuit court, too, stated Stone's activities in the squad were ill-defined.

¶26 Second, the State emphasizes that Stone testified the total time between the stop and the search of Thompson's vehicle was not "beyond the typical time of a traffic stop." Stone admitted, though, that he could not recall precisely how much time had elapsed. In any event, we must assess the functional considerations attendant to the stop in the context of the totality of the circumstances at issue in this particular case. *Floyd*, 377 Wis. 2d 394, ¶22. While the temporal duration of the stop might inform these considerations, it is not itself dispositive—one way or the other. *Id.*

¶27 Here, as Stone acknowledged to Thompson, the traffic offense was among the most minor of violations. Thompson was issued a verbal warning and therefore no time was needed for Stone to complete a citation. Moreover, the only apparent tasks that remained for Stone to perform in his squad involved a few additional computer inquiries. Nonetheless, the total amount of time between the stop and Thompson's confession was ten to fifteen minutes *plus* the unspecified amount of time necessary for Puetz to have a "lengthy conversation" with Thompson while Stone was in his squad. As we have explained, the evidence adduced at the evidentiary hearing was insufficient to establish that the length of the stop was reasonably related to the mission of the stop or attendant safety considerations.

¶28 The circuit court relied on *Floyd* as part of its reasoning, but *Floyd* appears to bolster Thompson's case under these circumstances. *Floyd* recognized that traffic stops are meant to be brief interactions with law enforcement officers, and they may last no longer than required to address the circumstances that made them necessary. *Id.*, ¶21. In *Floyd*, the defendant's vehicle had an expired registration and the defendant was unable to produce a driver's license or insurance information upon request. *Id.*, ¶¶2, 4. The initial contact lasted two to three minutes, and the officer was able to finish drafting the citations for all these offenses within five to six minutes after pulling the defendant's vehicle over. *Id.*, ¶¶4-5. We do not overread *Floyd*; that decision does not establish a yardstick by which to measure the reasonableness of every traffic stop's length.[7] But the

---

[7] Indeed, we are mindful of the dissent's caution in *Rodriguez v. United States*, 575 U.S. 348 (2015), that the rule articulated by the Court imposed a "one-way ratchet for constitutional protection linked to the characteristics of the individual officer conducting the stop." *Id.* at 361 (Thomas, J., dissenting). We stress that the reasonable duration of each stop must be based upon the totality of the circumstances in that particular case.

relatively prompt efforts of the officers there do suggest that the perhaps fifteen- to twenty-minute duration of the stop here for Thompson's minor traffic offense, in which he never failed to provide any documentation requested by police officers, was not justified.

¶29 Finally, the State attempts to distinguish *Rodriguez* as a dog-sniff case, while ignoring the undisputed testimony that Stone had already decided that he had reasonable suspicion to conduct a dog sniff of Thompson's vehicle by the time Puetz arrived at the scene. Contrary to the State's arguments, a dog sniff is not an enforcement mechanism directed to ensuring vehicles are operated safely and responsibly; dog sniffs are a measure designed to root out evidence of ordinary criminal wrongdoing. *Rodriguez*, 575 U.S. at 355. The fact that Stone was prepared (or preparing) to conduct a dog sniff lends further support to the notion that the length of the stop surpassed what was necessary to address the immediate traffic violation.

¶30 Relatedly, the State contends that even if the stop was impermissibly extended, the extension was itself supported by reasonable suspicion of drug activity. The circuit court adopted a vaguer iteration of this reasoning, concluding that the facts and inferences available to the officers could give rise to a reasonable suspicion that "criminal activity [was] afoot." We conclude the stop was not justifiably prolonged by reasonable suspicion that Thompson was involved in a drug offense.

¶31 An officer may extend a valid traffic stop if he or she "becomes aware of additional suspicious factors which are sufficient to give rise to an articulable suspicion that the person has committed or is committing an offense or offenses separate and distinct from the acts that prompted the officer's

13

intervention in the first place." ***Betow***, 226 Wis. 2d at 94-95; *see also* ***Rodriguez***, 575 U.S. at 355. Reasonable suspicion is a fairly low standard to meet, but such suspicion must be based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. ***State v. Anderson***, 2019 WI 97, ¶33, 389 Wis. 2d 106, 935 N.W.2d 285. A determination of reasonable suspicion is made based on the totality of the circumstances. ***Id.*** Whether the extension of the stop was supported by reasonable suspicion is a question of constitutional fact. ***State v. Popke***, 2009 WI 37, ¶10, 317 Wis. 2d 118, 765 N.W.2d 569.

¶32    The State argues there were five factors that led the officers to reasonably conclude Thompson was involved in a drug offense at the time his vehicle was stopped. The State initially points out that Thompson was (1) coming from a suspected drug house (2) at a late hour (3) in a vehicle with tinted windows. *See* ***State v. Floyd***, 2016 WI App 64, ¶16, 371 Wis. 2d 404, 885 N.W.2d 156, *aff'd*, 377 Wis. 2d 394 (observing "tinted windows add to suspicion because they suggest a possible desire … to conceal from outside observation persons, items or activity in the vehicle"); ***State v. Allen***, 226 Wis. 2d 66, 74-75, 593 N.W.2d 504 (Ct. App. 1999) (observing the reputation of an area and the time of day are relevant factors). The State also points out that Thompson was (4) extremely nervous and (5) gave "confusing, incomplete and evasive answers to routine traffic questions." *See* ***State v. Sumner***, 2008 WI 94, ¶38, 312 Wis. 2d 292, 752 N.W.2d 783 (noting a suspect's unusual nervousness may indicate wrongdoing); ***Betow***, 226 Wis. 2d at 97 ("[A] suspect's inadequate explanation for conduct can provide the basis for a suspicion that 'he is up to no good.'").

¶33    The State's reasonable suspicion conclusion rests on a house of cards that collapses upon close scrutiny. Importantly, there was no basis offered at

the suppression hearing to substantiate the officers' suspicion that the residence they were observing was involved in narcotics distribution. The officers were not asked to explain *why* they suspected the house in the first instance. Again, "reasonable suspicion" requires specific and articulable facts to justify the intrusion. Although the State attempts to shift the blame to Thompson for failing to develop an adequate record in this regard, the State bears the burden of proving that a seizure complied with the state and federal constitutions. *See **State v. Blatterman***, 2015 WI 46, ¶17, 362 Wis. 2d 138, 864 N.W.2d 26. The circuit court, too, noted that the State had failed to develop the officers' testimony regarding the basis for their belief that the house was involved in narcotics distribution.

¶34 Absent the connection to the suspected drug house, the State is left to rely on the time of night (around midnight), tinted windows, a very nervous driver, and what the officers viewed as an inadequate explanation for Thompson's activity and direction of travel. These are not "specific and articulable facts" suggesting Thompson was involved in a drug offense at the time of the traffic stop. The officers did not observe any contraband, they did not smell marijuana or other prohibited substances, and Thompson did not appear under the influence of any controlled substances.[8]

¶35 The facts available to the officers here are even less compelling than the facts we concluded were insufficient to justify the extension of a stop in ***State***

---

[8] There is also no evidence that the officers observed any items in the vehicle that are commonly used to conceal the smell of narcotics, such as the air fresheners police observed in ***State v. Floyd***, 2016 WI App 64, ¶16, 371 Wis. 2d 404, 885 N.W.2d 156, *aff'd*, 2017 WI 78, 377 Wis. 2d 394, 898 N.W.2d 560.

*v. Gammons*, 2001 WI App 36, 241 Wis. 2d 296, 625 N.W.2d 623.  In that case, the State argued that an extension of a traffic stop to conduct a drug investigation was warranted because the vehicle was stopped in a known "drug crime" area, it was 10:00 p.m., the vehicle was from out of state, the defendant appeared nervous, and the police knew the men in the vehicle had been involved in prior drug activity.  *Id.*, ¶21.  When the officer's initial questioning yielded "no additional suspicious factors suggesting drug activity," we concluded there was no further basis to continue detaining the defendant and the police were required to terminate the encounter.  *Id.*, ¶24.

¶36     As in *Gammons*, there was an insufficient basis under the totality of the circumstances to justify Thompson's continued detention in connection with a drug investigation based on the facts known to police at the time of the stop.  As explained above, Thompson had been in a suspected (not known) drug crime house (not a general area of known drug activity), with there being no explanation of why the house was suspected as such.  Moreover, although Stone was skeptical that Thompson was being truthful, none of his answers to Stone's questions were verifiably false, nor did they provide additional cause to believe Thompson had some involvement with narcotics.  At best, the officers had an inchoate suspicion or "hunch," which is insufficient to support an extension of the stop for the traffic offense.  *See State v. Guzy*, 139 Wis. 2d 663, 675, 407 N.W.2d 548 (1987).  We

therefore reverse the judgment of conviction and remand with directions that the circuit court grant Thompson's suppression motion.[9]

*By the Court.*—Judgment reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[9] Thompson requests that we also grant plea withdrawal. However, as his brief notes, plea withdrawal based upon the erroneous denial of a suppression motion need not be granted if the State can demonstrate that the error was harmless (i.e., that the defendant would have pled guilty even absent the erroneous ruling). "In a guilty plea situation following the denial of a motion to suppress, the test for harmless error on appeal is whether there is a reasonable possibility that the erroneous admission of the disputed evidence contributed to the conviction." *State v. Semrau*, 2000 WI App 54, ¶22, 233 Wis. 2d 508, 608 N.W.2d 376.

In this case, rather than make a harmless error determination without a developed record regarding Thompson's motivations and goals in pleading guilty to the two offenses, we think the better practice is to allow the circuit court the first opportunity to address any motion for plea withdrawal. The relief we grant is limited to reversing the judgment of conviction and remanding with directions for the circuit court to grant Thompson's suppression motion.