**2021 WI App 65**

# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:          2020AP731-CR

Complete Title of Case:


STATE OF WISCONSIN,

PLAINTIFF-APPELLANT,

V.

JOEL R. DAVIS,

DEFENDANT-RESPONDENT.


| | |
|---|---|
| Opinion Filed: | August 19, 2021 |
| Submitted on Briefs: | February 18, 2021 |

| | |
|---|---|
| JUDGES: | Blanchard, P.J., Fitzpatrick, and Graham, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *John A. Blimling*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Roberta A. Heckes*, Thorp. |

# COURT OF APPEALS DECISION DATED AND FILED

## August 19, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP731-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2019CF112**

IN COURT OF APPEALS

---

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

V.

JOEL R. DAVIS,

   DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Vernon County: DARCY JO ROOD, Judge. *Affirmed*.

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

¶1   GRAHAM, J. The State appeals an order suppressing evidence found during a traffic stop of Joel R. Davis. The circuit court suppressed the evidence because it determined that law enforcement impermissibly prolonged the stop by asking dispatch to inquire into the conditions of Davis's release on bond in

a pending criminal case. It is undisputed that the officer who stopped Davis sat in his squad car and conducted no recognized tasks incidental to the mission of the stop while he waited for a response to his inquiry about Davis's bond conditions. The State primarily directs us to ***Rodriguez v. United States***, 575 U.S. 348 (2015), to support its argument that, when police check the conditions of a motorist's release on bond, this is an "ordinary inquiry" that is incidental to the mission of a lawful stop, rather than an "unrelated investigation" that constitutes an impermissible detour from the mission of the stop.

¶2      We conclude that checking for bond conditions is not an "ordinary inquiry" as that term is used in ***Rodriguez***. Therefore, based on the circuit court's undisputed findings of fact, we conclude that law enforcement unconstitutionally prolonged the traffic stop beyond the time necessary to address the stop's mission. Accordingly, we affirm.

## BACKGROUND

¶3      On July 29, 2019, Officer Tilmer Thompson of the Viroqua Police Department conducted the traffic stop that resulted in Davis's arrest. Because the issue on appeal is whether Thompson unconstitutionally prolonged that stop, we relate the chronology of events in detail. The following summary is derived primarily from the circuit court's findings of fact, as supplemented by our observations from the video footage that was admitted into evidence during the suppression hearing. The State does not dispute these facts except as noted below.

¶4 Thompson stopped Davis's vehicle at approximately 7:40 p.m.[1] He told Davis that he had initiated the stop because Davis's vehicle did not have a passenger-side mirror. Likewise, in his initial report of this incident, Thompson wrote that he stopped Davis because Davis was operating a vehicle without a passenger-side mirror contrary to WIS. STAT. § 347.40(1) (2019-20).[2] The following day, Thompson updated his report to indicate that he also stopped Davis because he observed that Davis was not wearing a seat belt.

¶5 At 7:43:44, Thompson learned from dispatch that Davis's driver's license was suspended. Thompson returned to Davis's car and advised him that he should call someone for a ride on account of his suspended license.

¶6 Thompson returned to his squad car at 7:48:40. According to Thompson, he intended to write a citation for the missing mirror and to "run [Davis] to see if he's on bond."

¶7 At some point, Thompson learned from dispatch that Davis had a pending criminal case in La Crosse County in which he had been charged with possession of methamphetamine and carrying a concealed weapon. At 7:50:06, Thompson radioed dispatch and asked another officer to look into whether Davis was out on bond, and whether there were any conditions to that bond. Thompson

---

[1] During the suppression hearing, the parties introduced video from Thompson's body camera and from the camera on his squad car. The digital clocks on those two cameras were not synchronized. The circuit court used the time stamps from the body camera in its decision granting the motion to suppress, and, with one exception noted below, we use the time stamps set forth in the circuit court's order.

[2] The State has conceded that a passenger-side mirror is not required by WIS. STAT. § 347.40(1), and the circuit court later determined that Thompson was wrong about the requirements of that statute.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

later testified that he wanted information concerning Davis's bond conditions to determine whether they required him to submit to random urinalysis testing by law enforcement.

¶8 It is undisputed that, as of 7:50:06, Thompson did not have reasonable suspicion of anything other than driving with a suspended license, and perhaps a seat belt violation. It is also undisputed that, from that point forward, Thompson took no action in furtherance of writing a citation for any traffic offense. Instead, the circuit court found that, as reflected by the body camera footage, Thompson sat in his squad car doing nothing as he waited for dispatch to call someone in La Crosse County to inquire about Davis's bond conditions.

¶9 Shortly after Thompson radioed dispatch about the bond conditions, Officer Robert Raasch arrived on the scene. At 7:50:45, Raasch told Thompson that Davis is a "big-time dealer" who "carr[ies] his meth in his sock area." Raasch approached Davis's vehicle and attempted to engage Davis in conversation. He remained at or near Davis's vehicle for the duration of the stop.

¶10 At approximately 8:02 p.m., Thompson learned from dispatch that Davis's bond conditions were not related to driving and did not permit random drug testing by law enforcement.

¶11 Raasch later testified that, at some point while he stood by Davis's vehicle, he observed "bulges" in Davis's socks and his right pants pocket. Nothing in the record reflects when, precisely, Raasch made this observation. According to the State, Raasch developed reasonable suspicion that Davis had drugs in his possession based on this observation. For purposes of this appeal, we assume without deciding that the State's assertion about reasonable suspicion is correct.

¶12    A third officer arrived on the scene with a police dog at approximately 8:10 p.m.[3]  It is not clear from the record which of the officers requested the presence of the canine unit, nor is it clear when that request was made.  After the dog alerted to the presence of drugs, the officers ordered Davis out of the vehicle and searched him, finding a large amount of cash and a bag containing methamphetamine.

¶13    Davis was charged with possession with intent to deliver methamphetamine and felony bail jumping.  He filed a motion to suppress all evidence obtained from the traffic stop.  He argued, first, that the traffic stop was unconstitutional from the outset because it was not supported by reasonable suspicion or probable cause, and second, that even if the initial stop was constitutional, Thompson unconstitutionally prolonged the stop to wait for a canine unit to conduct a dog sniff.

¶14    After briefing and an evidentiary hearing, the circuit court granted Davis's motion.  The State appeals.

## DISCUSSION

¶15    The review of an order granting or denying a suppression motion presents an issue of constitutional fact.  *State v. Johnson*, 2013 WI App 140, ¶6, 352 Wis. 2d 98, 841 N.W.2d 302.  We uphold the circuit court's findings of fact

---

[3]  Although the circuit court opinion states that the canine unit arrived at 8:18 p.m., this is not accurate.  Based on the footage from Thompson's squad car, the police dog first approached Davis's vehicle at approximately 8:10 p.m.  It appears that the circuit court's mistake was due to mistranslation of the asynchronous time stamps—the event was captured on the squad car camera at approximately 19:18, which corresponded to approximately 8:10 p.m. on Thompson's body camera.

5

unless they are clearly erroneous, and we independently review the application of constitutional principles to those facts. *Id.*

¶16     "The Fourth Amendment to the United States Constitution prohibits unreasonable seizures."[4] *State v. Wright*, 2019 WI 45, ¶23, 386 Wis. 2d 495, 926 N.W.2d 157. This prohibition applies to traffic stops, which are considered seizures for constitutional purposes. *Id.* "The reasonableness of a traffic stop involves a two-part inquiry: first, whether the initial seizure was justified and, second, whether subsequent police conduct 'was reasonably related in scope to the circumstances that justified' the initial interference." *State v. Smith*, 2018 WI 2, ¶10, 379 Wis. 2d 86, 905 N.W.2d 353 (quoted source omitted). If the initial traffic stop was unconstitutional, or if the stop was unconstitutionally prolonged beyond the time it should have taken to complete it by "unrelated investigations," a defendant may be entitled to suppression of evidence obtained during that stop. *See Rodriquez*, 575 U.S. at 354-55.

¶17     Here, the circuit court did not make any explicit determination about the constitutionality of the initial traffic stop.[5] Instead, the court's order suppressing

---

[4] The Wisconsin Constitution contains similar protections. *State v. Floyd*, 2017 WI 78, ¶19, 377 Wis. 2d 394, 898 N.W.2d 560.

[5] Despite not making any explicit determination, the circuit court made a number of statements expressing skepticism about the credibility of Officer Thompson's testimony. Among other things, the court appeared to question Thompson's testimony that Davis was not wearing a seat belt. The court commented that Thompson told Davis and both officers on the scene that he stopped Davis for a mirror violation, that Thompson never mentioned any seat belt violation, and that the video from Thompson's body camera showed that Davis's seat belt was securely fastened when Thompson first approached Davis's car. Additionally, the court did not appear to credit Thompson's testimony that Davis was "shaking" and "sweating heavily in a manner that's not normal behavior." According to the court, "Davis's behavior as seen in the body cam did not support Thompson's observations." Finally, the court's apparent skepticism about Thompson's testimony appeared to be based in part on his demeanor when testifying.

the evidence was based on an alternative argument advanced by Davis that does not depend on the constitutionality of the initial stop. Davis's alternative argument is that Officer Thompson unconstitutionally prolonged the stop during the period of time in which he was waiting for dispatch to report back on whether Davis was subject to bond conditions. The court agreed with Davis's alternative argument and determined that Thompson unconstitutionality prolonged the stop by conducting a bond condition check. As the appellant, the State tells us that the sole question on appeal is a narrow one: whether checking for bond conditions is an "'ordinary inquiry' related to the mission of a traffic stop."[6]

¶18 We pause to comment on the circuit court's atypical approach to resolving Davis's suppression motion. Typically, when addressing a defendant's motion to suppress evidence obtained in a traffic stop, a circuit court will determine whether there was reasonable suspicion for the initial stop. In this case, there do not appear to have been any facts missing from the record before the circuit court that would have prevented it from determining whether the initial stop was constitutional. We considered whether we should remand the case for the circuit court to make definitive findings on this topic. However, neither party asks that we remand to the circuit court without resolving the question of law about ordinary inquiries that was raised by the State. If we were to remand, and if the circuit court were to conclude on remand that the stop was constitutional and did not provide a basis for suppressing the evidence, that determination would not resolve the question currently presented in this appeal about whether the evidence should be

---

[6] The State concedes that, if we were to conclude that Thompson's actions in checking for bond conditions did not unconstitutionally prolong the stop, we would have to "remand to the circuit court for a determination on the legality of the stop" and a determination as to "whether police had reasonable suspicion to extend the stop once they learned Davis was not subject to any relevant bond conditions."

7

suppressed because Thompson unconstitutionally prolonged the stop. Therefore, a remand for a determination about the constitutionality of the initial stop would likely result in an additional expenditure of judicial and party resources. Accordingly, under these circumstances, we assume without deciding that Officer Thompson had reasonable suspicion for the initial traffic stop, and we proceed to review the court's conclusion that checking for bond conditions is not an ordinary inquiry that can be used to constitutionally prolong a stop.

¶19 In the analysis that follows, we begin with a discussion of case law pertaining to ordinary inquiries. We then evaluate the State's argument that checking for bond conditions is an ordinary inquiry, and we conclude that it is not. Finally, we conclude that the State has forfeited any alternative arguments during the circuit court proceedings or on appeal.

I

¶20 In *Rodriguez*, the United States Supreme Court explained that a routine traffic stop "'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission'" of issuing a ticket for the violation. *Rodriguez*, 575 U.S. at 354-55 (quoted source omitted). "Authority for the seizure ... ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354; *see also* *State v. Floyd*, 2017 WI 78, ¶15, 377 Wis. 2d 394, 898 N.W.2d 560 ("A motorist is lawfully seized during the proper duration of a traffic stop, but unlawfully seized if it lasts longer than necessary to complete the purpose of the stop.").

¶21 The *Rodriguez* Court further explained that, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 575 U.S. at 355 (quoted source omitted).

As the Court explained, such inquiries "[t]ypically … involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* These checks "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*[7]

¶22     In *Smith*, our supreme court was presented with a situation in which an officer continued to detain a motorist in order to check his driver's license, an ordinary inquiry, even though there was no longer any other justification for the traffic stop. *Smith*, 379 Wis. 2d 86, ¶¶11, 21. It was undisputed in *Smith* that the initial vehicle stop was constitutional, but the reasonable suspicion that justified it dissipated as soon as the officer approached the vehicle. *Id.*, ¶14. The officer nevertheless continued the seizure to ask Smith for his driver's license, and during the exchange that followed, the officer developed probable cause to arrest Smith for intoxicated driving. *Id.*, ¶¶4-6. Smith argued that the officer unconstitutionally prolonged the seizure to ask for his license, but the court disagreed. *Id.*, ¶11. It concluded that the officer was allowed to complete the mission of checking Smith's license—even though the officer no longer had reasonable suspicion to seize him—because checking a driver's license is an ordinary inquiry that is "part of the original mission" of a lawful stop. *Id.*, ¶2; *see also id.*, ¶¶10, 11, 21.

¶23     The *Smith* court explained that "[t]he justification for the ordinary inquiries is two-fold: (1) these checks serve to enforce the traffic code by 'ensuring

---

[7] In addition, *Rodriguez* states that the "officer's safety interest stems from the mission of the stop itself." *Rodriguez v. United States*, 575 U.S. 348, 356 (2015) (citing *United States v. Holt*, 264 F.3d 1215, 1221-22 (10th Cir. 2001) (en banc) (recognizing an officer safety justification for criminal record and warrant checks), *abrogated on other grounds as recognized by United States v. Stewart*, 473 F.2d 1265, 1269 (10th Cir. 2007).

that vehicles on the road are operated safely and responsibly'; and (2) for officer safety." *Id.*, ¶19 (quoted source omitted).

¶24 The *Smith* court distinguished between "ordinary inquiries," which are "part of" the mission of a traffic stop, and "unrelated inquiries," which are not. *Id.*, ¶10 n.9. Officers may engage in unrelated inquiries during the course of a traffic stop—but, unless reasonable suspicion develops to support such inquiries, they cannot prolong the duration of the stop beyond the time that it reasonably should take to complete the mission. *Rodriguez*, 575 U.S. at 354; *see also id.* at 356 ("On-scene investigation into other crimes" are "unrelated inquiries" which impermissibly "detour" from the mission of the stop.). On the contrary, "[a]n expansion in the scope of the [initial] inquiry, when accompanied by an extension of time longer than would have been needed for the original stop, must be supported by reasonable suspicion." *See State v. Hogan*, 2015 WI 76, ¶35, 364 Wis. 2d 167, 183, 868 N.W.2d 124.

## II

¶25 With this legal framework in mind, we now turn to the sole question presented in the State's appellate briefing—whether a check for bond conditions is an ordinary inquiry, as that term is used in *Rodriguez*. In this case, the State acknowledges that there was a gap of unknown duration in the timeline between when Officer Thompson asked dispatch about Davis's bond conditions and when Officer Raasch purportedly observed bulges in Davis's socks. The State does not dispute that, during this time, Thompson was doing nothing but waiting to hear back from dispatch about Davis's bond conditions. And the State is unable to point to any evidence in the record that specifies when Raasch purportedly obtained

reasonable suspicion that Davis was carrying drugs in his socks.[8] To bridge this gap in the timeline, the State asks us to conclude that a check for bond conditions is an ordinary inquiry included in a traffic stop's mission.

¶26 For the reasons we now explain, we reject the State's arguments that bond condition checks are ordinary inquiries.

¶27 First, as stated above, the "typical" ordinary inquiries—those recognized in *Rodriguez*—are checking driver's licenses, requesting proof of vehicle insurance and registration, and checking for any outstanding warrants. Our supreme court has balked at the suggestion that this list should be expanded to include all tasks that could, in some indirect sense, be said to promote officer safety or to ensure that vehicles on the road are operated safely and responsibly. In *Smith*, the court explained that "[n]o court has expanded the ordinary inquiries incident to a traffic stop to include headlight, horn, or exhaust performance because the Fourth Amendment commands reasonableness." *Smith*, 379 Wis. 2d 86, ¶32 n.18. Likewise, in *Wright*, our supreme court determined that a records check to

---

[8] On appeal, the State asserts that Raasch observed the bulges "shortly after" Thompson radioed dispatch, "while the check for [Davis's] bond conditions was still pending." However, the State points to nothing in the record that supports its assertions related to the timing of Raasch's observation.

Raasch's observation of bulges is not mentioned in the police reports that were admitted during the hearing, nor is it discussed in the criminal complaint. During the hearing, Raasch did not testify as to when, specifically, he observed the bulges, and neither party offered footage from his body camera as an exhibit. The footage from Thompson's squad and body cameras contains no clues—the footage from the squad camera shows Raasch standing close to the passenger door of Davis's vehicle more or less consistently from approximately 7:51 p.m. until a police dog started to circle the vehicle. The circuit court did not make any findings about whether it credited Raasch's testimony, but even if it did, nothing in the record links Raasch's observation to any point of the chronology that is more specific than the approximately twenty-minute window between 7:51 p.m., when Raasch approached Davis's vehicle, and 8:11 p.m., when Thompson ordered Davis out of his car and conducted a pat-down search.

determine whether a motorist had a concealed carry permit was not an ordinary inquiry incident to a traffic stop. ***Wright***, 386 Wis. 2d 495, ¶36.

¶28 Second, the State does not point to any decision by any court that has recognized bond condition checks as ordinary inquiries, and our independent research has not revealed any such case. If we were to accept the State's invitation to expand the typical ordinary inquiries to include bond condition checks, we would be the first court to do so. Yet, as discussed below, the State advances no persuasive argument in favor of breaking new ground.

¶29 Third, despite asking us to expand the previously recognized ordinary inquiries to include bond condition checks, the State provides little information about what such checks would entail. The State does not direct us to any database that is readily available to Wisconsin officers on patrol and that contains information concerning a person's bond conditions. Here, in response to Officer Thompson's inquiry, it appears that dispatch was required to call someone in La Crosse County—presumably someone with access to court records—to determine whether Davis was subject to any such conditions. In this case, it took dispatch twelve minutes—an amount of time that is not negligible—to obtain an answer, and information about bond conditions may not always be even that readily available during future traffic stops.

¶30 Fourth, we reject the State's argument that bond condition checks should be considered ordinary inquiries because they promote officer and roadway safety. Based on the pertinent case law, an officer may take "negligibly burdensome actions relating to officer safety" during a traffic stop as part of the mission of the stop. ***State v. Brown***, 2020 WI 63, ¶¶1, 33, 392 Wis. 2d 454, 945 N.W.2d 584. However, in ***Rodriguez***, the Court determined that a dog sniff to detect the presence

of drugs was not part of the stop's mission and could not be justified as relating to safety concerns stemming from the mission of the stop. *Rodriguez*, 575 U.S. at 355-57. As the Court explained, "[h]ighway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.* at 357. A dog sniff "lack[ed] the same close connection to roadway safety" as the recognized ordinary inquiries. *Id.* at 356.

¶31     As noted, the amount of time it takes to complete bond condition checks may not be negligible. And the State makes no cogent argument as to how such checks directly promote officer and roadway safety. Here, Officer Thompson testified that he wanted to know whether the bond conditions provided authority to administer a drug test to Davis—presumably to determine whether he could use the results of a drug test to establish probable cause for an arrest for offenses including bail jumping.[9] To be sure, an officer's *subjective* motivations are not dispositive, and "we review law enforcement actions with an objective lens." *Brown*, 392 Wis. 2d 454, ¶25. Even so, the State does not articulate any *objectively reasonable basis* for concluding that an inquiry into bond conditions is needed to further any safety interests that stem from a routine traffic stop for an equipment or seat belt violation. Accordingly, we conclude that checks for bond conditions lack the "same close connection" to officer and roadway safety as the recognized ordinary inquiries. *See Rodriguez*, 575 U.S. at 356.

¶32     Finally, we reject the State's argument that bond condition checks should be recognized as ordinary inquiries because they are analogous to a check for outstanding warrants, which is recognized by case law as an ordinary inquiry.

---

[9] *See* WIS. STAT. § 946.49 (providing that "[w]hoever, having been released from custody under ch. 969, intentionally fails to comply with the terms of his or her bond is guilty of bail jumping").

*See Rodriguez*, 575 U.S. at 355. According to the State, "checking a person's bond conditions can reveal—much like a warrant check—that the person should not be driving, that he should be in custody, or that he might carry dangerous weapons." That may be so, but there are also significant differences between warrant checks and bond condition checks. For reasons we now explain, we conclude that any superficial similarity with warrant checks does not justify expanding the recognized ordinary inquiries to include bond condition checks.

¶33 A check for outstanding warrants is equally applicable to all motorists. When an officer runs a warrant check, the sole question is whether an existing order authorizes the motorist's arrest. The answer is either "yes" or "no," and no additional investigation is required. If there is an existing warrant, the officer can immediately take the motorist into custody.

¶34 In contrast, unlike a warrant, the mere existence of bond conditions does not necessarily provide preexisting authority to take the motorist into custody. As the State acknowledges, circuit courts and court commissioners in Wisconsin have broad discretion to impose various bond conditions, including, among others, restrictions on the defendant's travel, association, or place of abode; prohibitions against possessing weapons; absolute sobriety; requiring the defendant to return to custody at certain hours; and mandatory participation in mental health treatment. Once an officer determines the conditions of a bond, the officer can take the motorist into custody only if the officer compares those conditions to the observable facts and determines that there is probable cause to believe that the motorist is currently violating a bond condition and can be arrested for bail jumping.

¶35 For these reasons, bond condition checks are objectively understood as the first step of an impermissible inquiry, unsupported by reasonable suspicion

or probable cause, into whether the motorist is committing an additional crime of bail jumping at the time of the stop. This runs afoul of the prohibition against prolonging a stop to conduct unrelated investigations that detour from the stop's mission. *See Rodriguez*, 575 U.S. at 355-56 (providing that "ordinary inquiries" do not include inquiries that focus on finding evidence of other criminal acts); *Brown*, 392 Wis. 2d 454, ¶29 ("unrelated investigative inquiries" may not "'measurably extend the duration of the stop'" (quoted source omitted)).

¶36 In sum, we conclude that checking for bond conditions is not an ordinary inquiry incidental to the mission of a traffic stop. Officers may check bond conditions while simultaneously performing other mission-related tasks, *see Rodriguez*, 575 U.S. at 355, but they may not prolong a stop to inquire into a motorist's bond conditions without reasonable suspicion that the motorist is violating a bond condition, *see Hogan*, 364 Wis. 2d 167, ¶35.

III

¶37 As stated above, the State explicitly requests that we take up a single issue on appeal—whether the bond condition check was an ordinary inquiry. The State does not make any alternative arguments. A party forfeits a potential argument by not developing it in the circuit court and by not presenting it on appeal. *See Schill v. Wisconsin Rapids Sch. Dist.*, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177. Here, we conclude that the State forfeited any argument—apart from the argument about ordinary inquiries that we have rejected above—that law enforcement did not unreasonably delay the stop beyond the time at which it should have been completed consistent with the Fourth Amendment.

15

## CONCLUSION

¶38    Having determined that Thompson's check for bond conditions was not an ordinary inquiry, we affirm the order suppressing evidence obtained in the traffic stop.[10]

*By the Court.*—Order affirmed.

---

[10] Davis makes several additional arguments in support of affirming the circuit court. In addition to his argument that the initial stop was unconstitutional, Davis also argues that the evidence shows that the canine officer signaled his dog to give a positive "alert" to the presence of drugs, and that the officers did not have reasonable suspicion to search Davis's person for drugs. Because we uphold the circuit court's order on the ground that a bond condition check is not an ordinary inquiry, we need not address these arguments. "An appellate court need not address every issue raised by the parties when one issue is dispositive." *Barrows v. American Fam. Ins. Co*., 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508.